WILLIAM SIEBERT, SR., AND MYRLE SIEBERT, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3281–68.   Filed October 2, 1969.

*Robert Lloyd Jeffrey*, for the petitioners.
*James T. Finlen, Jr.*, for the respondent.

### OPINION

FAY, *Judge:* Respondent determined the following deficiencies in
the petitioners' income tax for the taxable years 1960 and 1963:

| Year | Deficiency |
| --- | --- |
| 1960 | $1, 641. 16 |
| 1963 | 3, 723. 70 |

On their Federal income tax return for the year 1963, petitioners
deducted $25,000 as an ordinary business loss incurred in that year.
Respondent disallowed such loss as a deduction against petitioners'
ordinary income and instead allowed it as a capital loss. As a result
of this disallowance, respondent determined deficiencies for the tax-
able years 1960 and 1963. The deficiency in 1960 resulted from adjust-
ments made to net operating losses incurred in 1963, which losses
were carried back to 1960.

The sole issue for decision is whether the loss incurred by petitioners
in the taxable year 1963 is to be treated as an ordinary business loss
or as a capital loss, which turns on whether the loss was a loss incurred
on section 1244 stock.

All of the facts have been stipulated by the parties. The stipulation
of facts and exhibits attached thereto are incorporated herein by this
reference.

1

William Siebert, Sr. (hereinafter referred to as Siebert), and Myrle Siebert are husband and wife. They were residents of Houston, Tex., at the time of the filing of their petition in this case. They filed a joint Federal income tax return for the calendar years 1960 and 1963 with the district director of internal revenue, Wichita, Kans.

Prior to January 14, 1960, Edward L. Bromley (hereinafter referred to as Bromley) was the sole owner of an excavating and dirt removal proprietorship which he operated under the name of Edward L. Bromley Excavating Co. On January 14, 1960, Bromley and Siebert entered into a written agreement whereby Siebert agreed to purchase a one-half interest in the Edward L. Bromley Excavating Co. for $15,000. The agreement also provided that the parties thereto would organize a corporation to be known as Bromley & Siebert Excavating, Inc. (hereinafter referred to as Excavating), and transfer all of the business assets of Edward L. Bromley Excavating Co. to the corporation in consideration for the corporation's issuance of 15,000 shares of its capital stock to each party or his nominee. They further agreed that each party would immediately purchase an additional $5,000 of capital stock of the corporation to provide the corporation with additional working capital. The agreement reads in part:

6. Upon the execution of this agreement and the payment of the consideration herein provided, it is agreed that a corporation shall be organized under the laws of the State of Colorado to be known as BROMLEY & SIEBERT EXCAVATING, INC., that simultaneously therewith both of the parties hereto will transfer and convey by good and sufficient bill of sale all their right, title and interest in said business and all of the assets thereof to said corporation; that said corporation will issue in consideration of said transfer Thirty Thousand (30,000) Shares of its capital stock, as follows:

Fifteen Thousand (15,000) Shares to the First Party or his nominee; and Fifteen Thousand (15,000) Shares to the Second Party or his nominee.

7. In addition to the foregoing and as part of the consideration for this transfer, each of the parties will forthwith purchase an additional Five Thousand ($5,000.00) Dollars of the capital stock of said corporation, which funds shall be used as additional working capital for the corporation.

On January 14, 1960, petitioners paid Bromley $15,000 for the purchase of a one-half interest in Edward L. Bromley Excavating Co. and on the same day Myrle Siebert drew a check on their joint checking account in the sum of $5,000 payable to the order of Excavating.

The Articles of Incorporation of Excavating was executed by the incorporators on January 14, 1960, and filed with the secretary of the state of Colorado on January 15, 1960. A certificate of incorporation was issued by the said secretary to the corporation on the latter date. The incorporators were Edward L. Bromley, Miriam J. Bromley, and the petitioners. The articles of incorporation provided in part:

## ARTICLE IV

### Authorized Shares

The total authorized capital stock of this corporation shall consist of Forty-nine Thousand (49,000) shares of common stock of the par value of One Dollar ($1.00) each, and there shall be no difference or distinction between the various shares. Each share of stock, when issued shall be fully paid and nonassessable.

\*     \*     \*     \*     \*     \*     \*

## ARTICLE VI

### Pre-Emptive Rights

The holders from time to time of the shares of the Corporation shall have the pre-emptive right to purchase * * * such of the shares of the Corporation as may be issued, from time to time, over and above the original issue which have never previously been sold. Such pre-emptive rights shall apply to all shares issued after the first original issue, whether such additional shares constitute a part of the shares presently or subsequently authorized * * *

The organizational meeting of the board of directors of Excavating was held on January 15, 1960. Bromley was elected president and Siebert vice president. William E. Siebert, Jr., petitioners' son, became the treasurer and Miriam J. Bromley the secretary of Excavating. The board of directors of Excavating consisted of the same four individuals.

A special meeting of the board of directors of Excavating was held on January 16, 1960. At this meeting, Bromley informed the board of directors that he had sold an undivided one-half interest in Edward L. Bromley Excavating Co. to Siebert for $15,000 and that they proposed to sell their interest in the business to the corporation in consideration for the issuance of 30,000 shares of capital stock of the corporation. The following resolution was presented and approved by all the directors:

BE IT RESOLVED, That this corporation accept the proposal of Messrs. Edward L. Bromley and William Siebert, whereby they will transfer and assign to this corporation all of their right, title, and interest in and to the assets of the business formerly known as Edward L. Bromley Excavating Co., and subject to the unpaid encumbrances now against said property which this corporation hereby assumes and agrees to pay, in consideration of the issuance of thirty thousand shares of the capital stock of this corporation to the said Edward L. Bromley and William Siebert, in equal shares, or to their nominees.

BE IT FURTHER RESOLVED, That the terms and provisions of the agreement dated January 14, 1960 by and between Edward L. Bromley as First Party and William Siebert as Second Party, be and the same is, hereby approved by this corporation.

BE IT FURTHER RESOLVED, That the officers of this corporation shall be, and that they are hereby authorized, and directed, to execute such instruments as may be necessary to carry the provisions of this resolution into effect.

At the same meeting Siebert advised the directors that under the provisions of the agreement of January 14, 1960, he and Bromley had

each agreed to subscribe for and purchase an additional 5,000 shares of stock of Excavating and the secretary of the corporation was instructed to issue an additional 5,000 shares of stock of the corporation to Bromley and an additional 5,000 shares to Siebert.

In accordance with the authorization at the special meeting of the board of directors, on February 1, 1960, Excavating issued 10,000 shares of its common stock to Siebert and 10,000 shares of its common stock to Myrle Siebert. Similarly, Bromley and his wife each received 10,000 newly issued shares.

Sometime between the date of its incorporation and July 4, 1960, Excavating began to experience financial difficulties. On July 4, 1960, a special meeting of the board of directors of Excavating was held in Derby, Colo., to discuss the financial difficulties of the corporation. After considerable discussion, Siebert offered to purchase an additional 5,000 shares of the authorized capital stock of the corporation of par value $1 for $5,000. The offer was accepted by Excavating. In order to keep the outstanding stock of the corporation equally divided between the Bromleys and Sieberts, a motion was proposed and adopted that Bromley would have the right to purchase an additional 5,000 shares of stock of Excavating. Pursuant to this proposal, 5,000 shares of stock of Excavating were issued to Siebert for $5,000 on July 5, 1960. However, no additional stock was ever issued to Bromley.

Excavating's financial difficulties continued. It became insolvent and ceased active conduct of business during October 1963. As a result, all of the Excavating shares held by petitioners became worthless in that year.

As a general rule, losses incurred when capital stock becomes worthless are capital losses and are deductible only to the extent of a taxpayer's capital gains plus $1,000 of his ordinary income. See secs. 165 (g)(1), 1211, and 1221.[1] However, section 1244 provides an exception to this rule for stock qualifying as "section 1244 stock" as therein defined. The sole issue presented for decision is whether petitioners' stock in Excavating constituted "section 1244 stock" so as to entitle petitioner to an ordinary loss deduction for losses resulting from the worthlessness of such stock.

Section 1244(c)(1) defines "section 1244 stock" generally as common stock issued by a domestic corporation pursuant to a plan, adopted by such corporation after June 30, 1958, to offer such stock for a period specified therein. The period, measured from the date of the adoption of the plan, must not exceed 2 years.

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Section 1244(e) empowers the Commissioner to prescribe such regulations as may be necessary to carry out the provisions of such section. The regulations issued in accordance with this express mandate, provide that the plan must be written [2] and specifically state in terms of dollars, the maximum amount to be received by the corporation as consideration for the stock to be issued thereunder. Sec. 1.1244(c)-1(c)(1), Income Tax Regs. The regulation reads in part: "(1) The common stock must be issued pursuant to a written plan adopted by the corporation * * * to offer only such stock during a period specified in the plan."

Respondent takes the position that the stock in question failed to meet the definitional requirements of "section 1244 stock" contained in the statute and regulations thereunder. Specifically, respondent contends that there was no written plan to offer stock for a specified period of time. Respondent further argues that even if a written plan existed, no maximum dollar amount receivable for the offered stock is contained therein.

Petitioners do not deny that the plan must fulfill the requirements set forth in the regulations, but insist that the various written documents offered into evidence, the relevant portions of which have been set forth above, constitute a written plan as contemplated by the regulations. We disagree.

The documents exhibited by petitioners which they allege constituted a written plan consist of a preincorporation agreement entered into by Bromley and Siebert on January 14, 1960, and minutes of a special meeting of Excavating's board of directors, held on January 16, 1960. The former provided that the parties to the agreement transfer to Excavating immediately upon its formation, the business assets of Edward L. Bromley Excavating Co. worth $30,000 in return for 30,000 shares of stock to be divided equally between the parties. It further provided that the parties would each purchase an additional 5,000 shares "forthwith." The corporate minutes contained a resolution accepting the proposal, made by Siebert and Bromley pursuant to their agreement, to purchase 40,000 shares of the authorized stock of Excavating. In spite of petitioners' insistence to the contrary, we cannot discern in these documents any of the elements required to be contained in a section 1244 plan under the regulations.

Initially we note that the resolution is framed in terms of an acceptance by Excavating of Siebert's proposal to purchase stock rather than an offer by the corporation to sell its stock. Petitioners seek to overcome this difficulty by suggesting that in the case of a closely held

---

[2] Support for these regulations is contained in the committee reports. H. Rept. No. 2198, 85th Cong., 1st Sess. (1958), 1959-2C.B. 714. "The stock must have been issued pursuant to a plan * * *. Such plan must be in writing and adopted after June 30, 1958."

corporation, the corporation's acceptance of an individual's offer to purchase stock is tantamount to its offer to sell stock. It is not necessary for us to decide whether petitioners' assertion is sound, since the other prescribed requirements of a section 1244 plan are also lacking in this case. The alleged plan did not specify a period of time during which the stock was to be issued. Nor did it contain a maximum dollar amount receivable for such stock.

To supply these obvious deficiencies in petitioners' alleged plan, petitioners argue that the January 16 "offering [of 40,000 shares] was complete in and of itself as of February 1, 1960," the date upon which the 40,000 shares were issued to petitioners and the Bromleys. The corporate resolution on January 16, they claim, constituted an "offer" and simultaneous acceptance by them of the sale of 40,000 shares of stock to petitioners and the Bromleys. They conclude that the period of the offer is therefore specified to be the period between January 16 and February 1, 1960. They further state that the maximum dollar amount for which stock may be issued under the "plan" was $40,000, the price paid for the shares pursuant to the agreement.

We cannot agree with petitioners that the January 16 "offering" constituted a plan to offer 40,000 shares of stock which was "complete in and of itself as of February 1, 1960." The fallacy underlying petitioners' reasoning is that it ignores the requirements contained in the regulations that the stock "be issued pursuant to a plan to offer *only* such stock during the period specified in the plan." (Emphasis supplied.) This regulation echoes the committee report which reads: "The stock must have been issued pursuant to a plan to offer *not more than a stated dollar amount* of stock during a period * * * specified in the plan." (Emphasis supplied.) H. Rept. No. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 714. The "plan," if indeed any plan existed, contemplated the sale of an unspecified amount of Excavating stock over an indefinite period of time. There is no indication in the record that Excavating intended to restrict its sale of stock to the initial issuance of 40,000 shares, or to the period between January 16 and February 1, 1960. On the contrary, the articles of incorporation filed January 15, 1960, authorize the issuance of 49,000 shares, only 40,000 of which were immediately issued. The corporation could have issued the remaining 9,000 authorized shares at any time and for any amount. In fact, the corporation issued an additional 5,000 shares of stock to Siebert on July 5, 1960, and gave Bromley an option to purchase the same amount. The preemptive rights provided for in the articles of incorporation also indicate its intention to issue additional shares "presently or subsequently authorized." Petitioners cannot hope to substitute their retrospective speculation regarding Excavating's plans as to the issuance of its stock for the well defined written plan contemplated by

the regulations. "[T]he requirements of the regulations are the epitome of simplicity and were promulgated because of an obvious need for a uniform method of applying section 1244." *Bernard Spiegel*, 49 T.C. 527, 531 (1968). We think no proper inference can be drawn from the two isolated sales which occurred on January 16, 1960, of 30,000 and 10,000 shares, that Excavating had drawn any plans for the issuance of its stock over a specified period. Moreover, the fact that no stock was issued after July 5, 1960, does not satisfy the requirements of section 1244(c)(1) since conditions of that section are required to be met at the time the alleged section 1244 stock is issued. *James A. Warner*, 48 T.C. 49 (1967), affd. 401 F. 2d 162 (C.A. 9, 1968). We therefore think it abundantly clear that the alleged plan did not contain a maximum dollar amount to be received pursuant to the plan. In addition, it failed to specify a period during which the stock would be issued.

In the recent case, *Spillers* v. *Commissioner*, 407 F. 2d 530 (C.A. 5, 1969), the Court of Appeals for the Fifth Circuit affirmed a Memorandum Opinion of this Court in which we held under facts similar to those presented in the case at bar, that the taxpayer was not entitled to an ordinary loss deduction because the "plan" was not limited in amount or duration. The stock for which the taxpayer claimed a section 1244 ordinary loss deduction was issued pursuant to a corporate resolution accepting the taxpayer's offer to transfer the business assets of a proprietorship he owned in exchange for the stock of the issuing corporation. The Fifth Circuit, in affirming that decision, pointed out:

the taxpayers loosely state that "where corporate minutes set forth a plan for the immediate issue of specified shares of stock for a specified amount of money less than $500,000.00, it is not necessary to add the superfluous and formal statements that such issuance must be completed within two years and that the consideration to be received must not exceed $500,000.00." If we put our imprimatur on what the taxpayers characterize as superfluous we would effectively repeal the requirements for § 1244 stock. * * *

The foregoing views of the Fifth Circuit concerning the requirements of section 1244 are equally applicable to the case at bar. As in *Spillers*, the petitioners in the instant case attempt to circumvent the requirements contained in the regulations by asserting that the plan for the immediate issue of specified shares of stock constituted a section 1244 plan.

We conclude that petitioners have failed to demonstrate minimum compliance with the requirements of section 1244(c) and that respondent's treatment of the losses occasioned by the worthlessness of their stock in Excavating as a capital loss is therefore correct.

*Decision will be entered for the respondent.*