*Decision will be entered for the respondent.*

MARCIA B. KAPLAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5346–69.    Filed October 26, 1972.

*Richard A. Waterval*, for the petitioner.
*Louis F. Nicharot*, for the respondent.

OPINION

FAY, *Judge:* Respondent determined deficiencies in petitioner's Federal income tax for the taxable years 1964 and 1967 in the amounts of $2,483.43 and $3,387.65, respectively.

The issues presented for our consideration are: (1) Whether the 50 shares of no-par-value common stock of Aintree Stables, Inc. (hereinafter referred to as Aintree or the corporation), that petitioner acquired on May 20, 1964, were issued pursuant to a written plan as contemplated by section 1244 of the Internal Revenue Code of 1954 [1] and the regulations thereunder for purposes of determining if petitioner's loss sustained with respect to these shares in the taxable year

---

[1] All statutory references hereinafter refer to the Internal Revenue Code of 1954, unless otherwise indicated.

1967 is properly characterized as an ordinary loss under section 1244; and (2) whether the 50 shares of no-par-value common stock of Aintree that petitioner acquired on January 23, 1967, were issued for money or other property within the meaning of section 1244(c)(1) (D) for purposes of determining if petitioner's loss sustained with respect to these shares in the taxable year 1967 is properly characterized as an ordinary loss under section 1244.

All of the facts have been stipulated by the parties. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner is an individual who was a resident of Washington, D.C., at the time of the filing of the petition in this case. Petitioner's Federal income tax returns for the taxable years 1964 and 1967 were filed with the district director of internal revenue, Baltimore, Md.

On May 11, 1964, Aintree was incorporated under the laws of the State of Virginia by petitioner, Margaret Elizabeth Kenworthy, Cleave Deck, Richard A. Waterval, and Joseph A. Keating. Aintree was formed to provide a riding stable for public and private hire and to provide equestrian instruction for the general public. Aintree's articles of incorporation provided that its authorized capital stock would consist of 100 shares of no-par-value common stock. The articles of incorporation further provided that the five incorporators would serve as the corporation's initial directors.

On May 20, 1964, the first meeting of the incorporators of Aintree was held. At this meeting the corporation's articles of incorporation and certificate of incorporation were accepted and approved, and the directors named in the articles of incorporation were ratified as Aintree's first directors.

The incorporators further authorized the board of directors "to issue [Aintree's capital] stock to the full amount or number authorized by the articles of incorporation in such amounts and proportions as from time to time shall be determined by the board."

The first meeting of Aintree's board of directors was also held on May 20, 1964. At this meeting, the board of directors authorized the appropriate officer(s) of Aintree to issue to petitioner a certificate representing 50 shares of Aintree's no-par-value common stock for which petitioner had subscribed and paid $20 per share in cash. Moreover, the board of directors granted Margaret Elizabeth Kenworthy and Cleave Deck options to purchase 24.5 shares of Aintree's no-par voting common stock at an exercise price of $20 per share. The options could be exercised at any time until May 20, 1974. The options were never exercised and were ultimately canceled and withdrawn by Aintree's board of directors on January 23, 1967.

Petitioner was advised by Aintree's attorney and by Aintree's corporate secretary on several occasions during the period between September 16, 1964, and January 23, 1967, that Aintree's future business prospects were poor and that continued capital investments in Aintree would be futile. Petitioner disregarded this negative advice and continued to be optimistic about Aintree's economic potential. In fact, she made numerous advances of capital to Aintree from May 20, 1964, to January 23, 1967. As of January 23, 1967, the total amount of petitioner's advances to Aintree was $30,133.98.

Aintree did not issue any promissory notes or other evidences of indebtedness with respect to these advances. The parties also made no provisions for the payment of interest by Aintree to petitioner and, in fact, no interest payments were made.

The 12th meeting of Aintree's board of directors was held on January 23, 1967. At this meeting petitioner offered to cancel $24,000 of the corporation's purported indebtedness to her in consideration for the issuance of an additional 50 shares of Aintree's no-par voting common stock. In accepting petitioner's offer, the board of directors adopted the following resolution:

Whereupon, Mrs. Kaplan announced that she would immediately offer to cancel $24,000.00 of her prior loans to the Corporation in consideration of immediate issuances of an additional 50 shares of the common stock of the Corporation; and whereupon the Board of Directors, upon motion made, seconded, and unanimously carried,

RESOLVED that Mrs. Kaplan's offer is accepted and the Secretary is directed to immediately issue forthwith the remaining 50 shares of authorized common stock of the Corporation to Mrs. Marcia Kaplan and note the stock record transfer books accordingly.

Petitioner's purported $30,133.98 indebtedness to Aintree was a worthless claim on January 23, 1967, and had a fair market value of zero as of that date.

From January 23, 1967, to September 1, 1967, petitioner made additional advances totaling $5,510 to Aintree. Aintree did not issue any promissory notes or other evidences of indebtedness with respect to these advances. The parties also made no provisions for the payment of interest by Aintree to petitioner and, in fact, no interest payments were made.

On September 1, 1967, Aintree's board of directors decided to terminate the corporation's business. Aintree adopted a plan of liquidation on September 15, 1967, and ceased doing business sometime during September 1967.

Petitioner advanced an additional $625 to Aintree during the period from October 23, 1967, to November 14, 1967. Aintree did not issue any promissory notes or other evidences of indebtedness with respect to

these advances. The parties made no provisions for the payment of interest by Aintree to petitioner and, in fact, no interest payments were made.

Petitioner's total advances to Aintree from May 20, 1964, to November 14, 1967, amounted to $36,268.98. The parties did not provide for a maturity date for the repayment of the moneys advanced by petitioner to Aintree. The $36,268.98 that petitioner advanced to Aintree was used to meet Aintree's day-to-day operating needs. Aintree did not repay any of these advances from petitioner with the exception of a nominal repayment of $82.72 that was designed to close the corporation's bank account after providing for the corporation's creditors pursuant to the plan of liquidation.

On her Federal income tax return for the taxable year 1967 petitioner claimed a $25,000 ordinary loss resulting from the exchange of section 1244 stock and a nonbusiness bad debt deduction of $12,186.26 resulting from petitioner's advances to Aintree. Petitioner filed an "Application for Tentative Carryback Adjustment" on April 29, 1968, in order to carry back to the taxable year 1964 her unused portion of the claimed net operating loss for the taxable year 1967. In his notice of deficiency, respondent disallowed petitioner's claimed ordinary-loss deduction.

As a general rule, losses incurred when capital stock becomes worthless are capital losses and are deductible only to the extent of the taxpayer's capital gains plus $1,000 of his ordinary income. See secs. 165(g)(1), 1211(b), 1221, and 1222. However, section 1244 provides ordinary-loss treatment for "section 1244 stock." The sole issue presented in the instant case is whether petitioner's stock in Aintree (which consisted of the 50 shares acquired on May 20, 1964, and the additional 50 shares acquired on January 23, 1967) constituted "section 1244 stock" so as to entitle petitioner to an ordinary-loss deduction for losses resulting from the worthlessness of such stock.

Section 1244(c)(1) defines "section 1244 stock" as common stock issued by a domestic corporation pursuant to a plan adopted by such corporation after June 30, 1958, to offer such stock within 2 years from the date of the adoption of the plan.

Section 1244(e) empowers the Commissioner to prescribe such regulations as may be necessary to carry out the provisions of section 1244. The regulations issued in accordance with this express mandate provide that the plan must be written[2] and must specifically state the

---

[2] Support for the "written plan" requirement in sec. 1.1244(c)–1(c)(1), Income Tax Regs., is found in H. Rept. No. 2198, 85th Cong., 1st Sess. (1958), 1959–2 C.B. 709, 714. "The stock must have been issued pursuant to a plan * * *. Such plan must be in writing and adopted after June 30, 1958." Moreover, this Court has held that the "written plan" requirement in the regulations is both valid and reasonable. See *Bernard Spiegel*, 49 T.C. 527, 531 (1968).

maximum amount of dollars to be received by the corporation as consideration for the stock to be issued thereunder. See sec. 1.1244(c)–1(c)(1), Income Tax Regs.

Respondent's position is that the stock in question failed to meet the definitional requirements of "section 1244 stock" contained in the statute and regulations thereunder. Specifically, respondent contends that with respect to each of petitioner's acquisitions of Aintree's stock on May 20, 1964, and January 23, 1967, there was no written plan by Aintree to offer such stock within the required 2-year period. Moreover, as to petitioner's acquisition of 50 shares of Aintree's stock on January 23, 1967, respondent contends that, even if there was a written plan with respect to such stock, Aintree's purported indebtedness to petitioner in fact constituted equity and, thus, the stock that was issued to petitioner on January 23, 1967, in exchange for the cancellation of $24,000 of Aintree's purported indebtedness to petitioner was *not* issued for money or other property within the meaning of section 1244(c)(1)(D).

Petitioner argues that the minutes of the first and 12th meetings of Aintree's board of directors held on May 20, 1964, and January 23, 1967, respectively, constitute written plans within the meaning of section 1.1244(c)–1(c)(1), Income Tax Regs., for the respective issuances of Aintree's stock to petitioner on May 20, 1964, and January 23, 1967. Petitioner further argues that, assuming that the minutes of the board of directors meeting held on January 23, 1967, did constitute a written plan, petitioner's advances to Aintree were valid indebtedness for Federal income tax purposes, and that the stock issued to petitioner in exchange for her cancellation of $24,000 of Aintree's purported indebtedness to her was issued in exchange for money or other property. We disagree with petitioner's arguments.

With respect to the minutes of the May 20, 1964, meeting of the board of directors, these minutes contained resolutions specifying (1) that petitioner had subscribed and paid for $1,000 of the corporation's stock and that a certificate representing 50 shares of the corporation's stock should accordingly be forwarded to petitioner ("the stock-issuance resolution"), and (2) that Margaret Elizabeth Kenworthy and Cleave Deck were granted an option to acquire 24.5 shares each of the corporation's stock at an exercise price of $20 per share ("the option resolution"). The latter resolution further provided that these options could be exercised at any time during the 10-year period beginning May 20, 1964, and terminating May 20, 1974.

Petitioner apparently contends that the stock-issuance resolution in the minutes of the May 20, 1964, board of directors meeting should be isolated from the option resolution contained in these minutes, and

that the stock-issuance resolution should be construed in and of itself as a written plan within the meaning of the "section 1244 stock" regulations. In effect, petitioner contends that, although the stock-issuance resolution does not expressly specify a period of 2 years from the date of the adoption of the plan within which the stock must be offered, the fact that the 50 shares of the corporation's stock were issued to petitioner on May 20, 1964, should be interpreted as if the "offering" of these 50 shares was completed as of May 20, 1964.[3] Under such construction, therefore, petitioner alleges that the 2-year requirement was technically complied with, since the plan was purportedly adopted on May 20, 1964, and the offering of all of the stock pursuant to such plan was purportedly completed on the very same day.

We are not persuaded by petitioner's construction of the facts. Even if we assumed that the minutes of the May 20, 1964, board of directors meeting constituted a written plan, we cannot ignore the option resolution contained in the minutes of the board of directors meeting. The option resolution and the stock-issuance resolution were both adopted at the same board of directors meeting. We can find no rational basis for excluding the 49 shares of Aintree stock specified in the option resolution from the purported plan. Therefore, the purported plan violates the requirements of section 1244 and the regulations thereunder as *all* of the stock issued pursuant to the alleged plan was *not* offered during the required 2-year period which began on the date of the plan's adoption. An option is a standing offer that may be accepted by the promisee at any time during its life. Moreover, acceptance by the promisee results in the maturation of the option into a binding contract on both parties. See, generally, *Naylor* v. *Commissioner*, 203 F.2d 346 (C.A. 5, 1953). Accordingly, since the options in the instant case were exercisable at any time during a 10-year period, the 49 shares subject to the option resolution must be construed as having been offered for a 10-year period from the date of the purported plan's adoption. This patently violates the maximum 2-year period for offering such stock as required by the statute and the underlying regulations.

Finally, the fact that the options were subsequently canceled prior to exercise of any of the options is irrelevant. The technical requirements of section 1244(c)(1) must be satisfied at the time that the alleged section 1244 stock is issued. See *William Siebert, Sr.*, 53 T.C. 1 (1969); and *James A. Warner*, 48 T.C. 49 (1967), affd. 401 F.2d 162 (C.A. 9, 1968). We therefore conclude that the alleged plan did

---

[3] Although the 50 shares were subscribed and paid for prior to the adoption of the purported plan, sec. 1.1244(c)–1(c)(3), Income Tax Regs., specifically provides that such stock will be construed as having been issued pursuant to the plan if the stock is *not*, in fact, issued prior to the adoption of the plan. Sec. 1244 applicability, however, would still be contingent upon a determination that all technical requirements of sec. 1244 had been satisfied.

not satisfy the required 2-year provision of section 1244(c)(1)(A) and the regulations thereunder,[4] and that the 50 shares of Aintree's stock issued to petitioner on May 20, 1964, did not qualify as "section 1244 stock."[5]

With respect to the issue of whether petitioner's acquisition of 50 shares of Aintree's stock on January 23, 1967, constituted "section 1244 stock," we note initially that the issuance of such stock to petitioner was authorized at the 12th meeting of Aintree's board of directors, which was held on January 23, 1967. The minutes of this meeting contained a resolution accepting petitioner's offer to cancel $24,000 of Aintree's purported indebtedness to her in consideration for issuance of 50 shares of Aintree's stock to her. It should be observed that the resolution is structured in terms of an acceptance by Aintree of *petitioner's* offer to acquire Aintree's stock instead of an offer by *Aintree* to sell its stock to petitioner. Petitioner apparently suggests that this difficulty can be surmounted by the explanation that, in a closely held corporate context, the corporation's acceptance of an individual's offer to purchase stock is the equivalent of the corporation's offer to sell its stock to the purchasing individual. We do not find it necessary to decide this issue, however, since the 50 shares of Aintree's stock acquired by petitioner on January 23, 1967, were not issued for the consideration prescribed in section 1244(c)(1)(D).[6]

Section 1244(c)(1)(D) provides that one of the definitional requirements of "section 1244 stock" is that such stock must be issued by the issuing corporation "for money or other property (*other than stock* and securities.)" (Emphasis added.) Section 1.1244(c)–1(f), Income Tax Regs., further provides that the phrase "stock and securi-

---

[4] Although we do not wish to penalize small, unsophisticated taxpayers for not strictly complying with formalities, we would be committing gross error if we ignored the 2-year requirement contained in sec. 1244(c)(1)(A) and the underlying regulations. Taxpayer has introduced no evidence to establish compliance with this requirement, and, thus, must endure the consequences of her noncompliance.

[5] It should be observed that there is an additional reason for concluding that the 50 shares issued to petitioner on May 20, 1964, did not qualify as "section 1244 stock." That is, Aintree had authorized capital stock of 100 shares of no-par voting common stock. Yet the purported plan only referred to 99 shares of stock, i.e., the 50 shares issued to petitioner and the 49 shares covered by the option agreements. Thus, Aintree had an additional 1 share of stock that it could issue at any time and for any price that it might determine. The regulations under sec. 1244 require that the section 1244 stock be issued pursuant to a plan to offer only such stock during the period specified in the plan and that the maximum dollar amount to be received for such stock must be stated in the plan. Since Aintree could technically have also intended to offer the additional 1 share of stock at an unspecified price during the offering period stated in the plan, the regulatory requirements (which were designed to limit the offering period and to require a statement of the maximum dollar amount to be derived by the offering) would accordingly be violated by this potential factor.

[6] We have also found it unnecessary to consider the preliminary issue of whether the minutes of the 12th meeting of Aintree's board of directors, which was held on Jan. 23, 1967, constituted a written plan within the meaning of the regulations. Regardless of whether these minutes did constitute a written plan, the stock issued was not "section 1244 stock" since the definitional requirement of sec. 1244(c)(1)(D) was not satisfied.

ties" includes stock and securities of the issuing corporation; thus, stock issued in exchange for stock of the issuing corporation cannot qualify as "section 1244 stock." [7]

In determining whether petitioner acquired the 50 shares of Aintree's stock on January 23, 1967, in exchange for money or other property, we must decide whether the moneys advanced by petitioner to Aintree during the period from May 20, 1964, to January 23, 1967, constituted capital contributions or valid indebtedness for Federal income tax purposes.

Respondent contends that the purported loans were in effect capital contributions and that the loans should, thus, be recharacterized as equity. Petitioner contends that the loans were valid indebtedness. We disagree with petitioner's contention.

Petitioner argues that the language of section 1.1244(c)–1(f)(1), Income Tax Regs., establishes that the 50 shares of Aintree's stock acquired by petitioner on January 23, 1967, were acquired for money or other property. This regulation provides, in part, as follows:

Stock issued in consideration for cancellation of indebtedness of the corporation shall be considered issued in exchange for money or other property unless such indebtedness is evidenced by a security, or arises out of the performance of personal services.

Petitioner thus concludes that since (1) the involved stock was issued to petitioner in exchange for petitioner's cancellation of indebtedness to the corporation and (2) the indebtedness was *not* evidenced by a security and did *not* arise out of the performance of personal services, the requirements of this regulation have been complied with and the stock should qualify for section 1244 treatment.

Petitioner's argument is fallacious in that it ignores the crucial question in point. Section 1.1244(c)–1(f)(1), Income Tax Regs., second sentence, becomes operative only if the advances in issue constitute valid indebtedness for Federal income tax purposes. Therefore, petitioner's argument is premised on the assumption that her advances to Aintree constitute valid indebtedness. We find this initial assumption to be wholly unsupportable.

Petitioner may very well have intended for the advances to be considered as loans. However, we believe that the "objective" intent of

---

[7] The legislative history underlying sec. 1244 clearly establishes that the reason why Congress decided to exclude stock or securities of the issuing corporation as permissible consideration for "section 1244 stock" is that no new capital is being committed to the corporation in such cases. If an already existing equity interest could qualify as proper consideration for the issuance of "section 1244 stock," no additional capital would be infused into the corporation and, thus, the sole effect of this exchange would be the tax-desirable consequences of converting a capital loss into an ordinary loss. See H. Rept. No. 2198, *supra* at 710. See also *Hollenbeck* v. *Commissioner*, 422 F.2d 2 (C.A. 9, 1970), affirming 50 T.C. 740 (1968); *J. Paul Smyers*, 57 T.C. 189 (1971); and *Raymond G. Hill*, 51 T.C. 621 (1969).

the parties takes precedence over their "subjective" intent in characterizing purported debt for Federal tax purposes. See *Wood Preserving Corporation of Baltimore* v. *United States*, 347 F.2d 117, 119 (C.A. 4, 1965).

The objective intent in the instant case is clearly established by the following factors standing alone: (1) Aintree was inadequately capitalized from its inception; (2) Aintree did not issue any promissory notes or other evidences of indebtedness to petitioner; (3) the parties failed to provide for interest payments by Aintree to petitioner; and (4) petitioner's advances to Aintree did not have a maturity date.

*Undercapitalization of Aintree.*—Aintree was initially capitalized with $1,000. The conclusion that this amount was inadequate from the corporation's beginning is supported by evidence in the record that petitioner advanced $2,340.98 to Aintree during May 1964 and that petitioner made total advances to Aintree of $12,340.98 during the period from May 1964 through December 1964. The fact that all of petitioner's advances to Aintree during 1964 were used in Aintree's day-to-day operations strongly supports the conclusion of Aintree's undercapitalization, since it indicates that Aintree's incorporators did not provide Aintree with the equity capital required to conduct its planned operations. See *Arlington Park Jockey Club* v. *Sauber*, 262 F.2d 902 (C.A. 7, 1959).[8]

*Lack of promissory notes or other evidences of indebtedness.*—Neither formal use of notes or debentures nor the making of appropriate book entries can substantively convert a capital contribution into a valid indebtedness. See *Fin Hay Realty Co.* v. *United States*, 398 F.2d 694 (C.A. 3, 1968); and *W. C. Gamman*, 46 T.C. 1 (1966). However, the petitioner's *failure* to follow form is certainly evidence that the advances were not intended to be debt. See *First Mortgage Corp.* v. *Commissioner*, 135 F.2d 121 (C.A. 3, 1943), affirming a Memorandum Opinion of the Board of Tax Appeals.

*Failure to provide for interest payments.*—This factor is indicative that the purported debt was actually a capital contribution. See *Road Materials, Inc.* v. *Commissioner*, 407 F.2d 1121 (C.A. 4, 1969), affirming and remanding a Memorandum Opinion of this Court.

*Absence of maturity date.*—This factor is strongly indicative that the purported debt was actually a capital contribution. See *Jewel Tea Co.* v. *United States*, 90 F.2d 451 (C.A. 2, 1937).

---

[8] We recognize that although the advances in 1964 may be characterized as capital contributions due to the corporation's undercapitalization, the advances in the years subsequent to 1964 could still be found to be valid indebtedness. See *Rowan* v. *United States*, 219 F.2d 51 (C.A. 5, 1955). However, we believe that the additional factors of lack of promissory notes or other evidences of indebtedness, failure to provide for interest payments, and absence of maturity dates, reflect that *all* advances made by petitioner (whether in 1964 or in subsequent years) were capital contributions and *not* valid indebtedness. See *J. Paul Smyers, supra.*

We hold that the existing factors of inadequate capitalization, lack of maturity dates, failure to provide for interest charges, and absence of promissory notes or other formal indicia of evidences of indebtedness support the conclusion that the advances constituted risk capital and *not* bona fide loans. Therefore, since petitioner's advances to Aintree constituted equity capital, petitioner's acquisition of the 50 shares of Aintree's stock on January 23, 1967, in exchange for cancellation of the purported indebtedness created by the advances was *not* made for money or other property. Accordingly, the violation of this definitional requirement of section 1244(c)(1)(D) precludes such stock from qualifying as "section 1244 stock."

*Decision will be entered for the respondent.*