RUSSELL L. AND BONNIE C. SHORT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Short v. Commissioner
Docket No. 23526-83.
United States Tax Court
T.C. Memo 1986-360; 1986 Tax Ct. Memo LEXIS 248; 52 T.C.M. (CCH) 130; T.C.M. (RIA) 86360; August 7, 1986. *248 Petitioners owned 50 percent of the stock of a corporation incorporated in 1977 that became worthless in November 1980. Held: Petitioners stock in the corporation did not qualify as section 1244 stock. Held,Further: Loans from petitioners to the corporation and claims for uncollected rental due petitioners from the corporation, which became worthless in 1980, were non-business bad debts. Gerald A. Dechow and James W. Hopper, for the petitioners. T. Keith Fogg, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies and additions to tax in petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency
Sec. 6651(a)(1) [1]
Sec. 6651(a)(2)
1978
$17,832.99
$4,458.25
$378.56
1979
1,973.46
19.84
1980
40,668.03
1981
11,956.00
After concessions by both parties, [2] *250 the issues remaining for our decision are (1) whether the issuance of stock by Roanoke Truck Sales, Inc. (RTS), complied with section 1244 resulting in petitioners incurring ordinary losses when the stock became worthless in 1980; and (2) whether *249 loans made by petitioners to RTS are deductible as business bad debts. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. The pertinent facts are summarized below. Petitioners Russell L. and Bonnie C. Short are individual taxpayers whose legal residence was Roanoke, Virginia at the time they filed their petition in this case. Petitioners separated on January 5, 1981, and were subsequently divorced. Petitioners filed joint Federal income tax returns for the calendar years 1977, 1978, 1979, 1980 and 1981, with the Internal Revenue Service Center in Memphis, Tennessee. Petitioners' 1978 return was filed untimely on December 19, 1979, reflecting a total tax due of $26,322.95. Petitioners had withholding tax credits for 1978 of $4,169.16. The 1978 return was filed with no remittance. Petitioners' 1979 return reflected a total tax due of $9,719.45. Petitioners had withholding tax credits of $5,010.20. This return was filed untimely on June 19, 1980, with no remittance. RTS filed its articles *251 of incorporation on December 29, 1976. Its certificate of incorporation was issued January 6, 1977. Petitioner Russell L. Short (Russell), and Hal J. Cooper (Cooper), were listed as the initial directors of RTS' Board of Directors. Russell and Cooper both signed the articles of incorporation. The corporate purpose for the formation of RTS was described as follows: To sell, lease, purchase, demonstrate, repair and deal in new and used motor vehicles of all kinds, as well as engines, chassis, bodies, tires and all parts, accessories and supplies of motor vehicles; and to conduct any other business not prohibited by law not required to be stated in the Articles of Incorporation. RTS' articles of incorporation refer to the adoption of a section 1244 plan as follows: To the extent permitted by law all common stock of the corporation shall qualify as "Section 1244 Stock" within the meaning of section 1244 of the Internal Revenue Code of 1950, as amended and Treasury regulations promulgated thereunder. Harvey S. Lutkins acted as the attorney for RTS in preparing its corporate documents including the plan to distribute section 1244 stock. Petitioners' section 1244 plan as submitted into *252 evidence is a preprinted form with blank spaces where one is to supply the dollar amount of the common stock to be issued, the date the plan was adopted, and the signature of the corporation's secretary. None of these blank spaces was filled in. The corporate minutes and section 1244 document were not signed by Russell. Cooper signed the corporate minutes but not the section 1244 document. Prior to forming RTS, Russell and Cooper had an auto parts business that they conducted on a small scale. They then decided to move this business into a building owned by petitioners and formed RTS. Russell and Cooper were the sole stockholders of RTS. Petitioner Bonnie C. Short (Bonnie), was employed by RTS as its president. Bonnie was a high school graduate and had also attended Brandon Secretarial and Accounting School in 1971. As president of RTS, she was in charge of "all the ordering, all the hiring, the clerical work, [and] the financial work." Bonnie at no time owned any stock or invested any money in RTS. She reported salaries from RTS in 1978, 1979, and 1980 as $9,495, $15,600, and $7,125, respectively. Prior to being employed as president of RTS, Bonnie worked as president of Short's *253 Boat Sales which sold marine parts. Short's Boat Sales was incorporated and was owned by Russell. Russell at no time reported any income except rental income from RTS. [3]
Petitioners' basis in RTS for purposes of computing a gain or loss is $16,200. Petitioners' stock in RTS became worthless in November of 1980. Petitioners owned the land and building where RTS conducted its operations. From 1978 to 1980, RTS was charged rent by petitioners. RTS deducted the rent on its corporate tax returns and petitioners included the rent in their individual tax returns although none of the rent was ever actually received by petitioners. Petitioners reported gross rental income from RTS in 1978, 1979, and 1980 of $18,000, $21,600, and $21,600, respectively. [4]
Russell received and reported compensation income from Russell Short, Inc. in the amounts of $23,400, $26,000, and $29,400 for the years 1978, 1979 and 1980, respectively. In July 1979, petitioners loaned RTS *254 $60,000 for working capital. They obtained the money through a personal loan from United Virginia Bank. Bonnie stated that at this time RTS was selling transfer trucks and needed additional working capital. Petitioners used the inventory of RTS, the building and its land, as collateral for the loan. RTS made several payments to petitioners on this loan; however, as of November 1980, RTS owed petitioners $43,500 on this debt. In October 1980, petitioners obtained an additional loan from United Virginia Bank. Of this loan, $48,330 was used to satisfy a corporate debt of RTS which petitioners had personally guaranteed. Bonnie stated that this loan was obtained to "keep the business going." The inventory of RTS, the building and land, were again used as collateral. RTS made no payments to petitioners for these funds. On November 20, 1980, RTS ceased doing business. At this time, Bonnie's employment as president of RTS also ceased. Bonnie drew unemployment from November 20, 1980, until sometime in January of 1981. On February 28, 1981, she began a new job working for Virginia Farm Bureau Insurance. Her income from this job amounted to $12,288 in 1981. Bonnie obtained the job in *255 order to support herself. Petitioners had separated on January 5, 1981, and Russell was supporting their children. OPINION We must determine whether the initial offering of RTS stock complied with section 1244. Respondent contends that a section 1244 plan was not adopted by RTS as the plan was never signed by anyone in behalf of the corporation. Respondent further contends that whether or not RTS intended to adopt a section 1244 plan cannot be determined since neither Russell, nor Cooper, or RTS' attorney testified at the trial of this case. In the alternative respondent contends that even if the RTS stock was issued pursuant to a valid section 1244 plan, petitioners do not qualify for section 1244 treatment because some of their stock was issued for services. Petitioners contend that a section 1244 plan was adopted by RTS despite the fact that the plan was never formally signed by Russell or Cooper. Petitioners contend that they relied upon their attorney to prepare the necessary documents to adopt a section 1244 plan and therefore should not be penalized for not signing the documents since they believed that all the requirements to adopt a section 1244 plan had been completed. *256 Petitioners conclude that the fact that they intended to adopt a section 1244 plan should control in determining whether such a plan was adopted. For the reasons detailed below, we agree with respondent. Section 1244 provides that, subject to certain conditions and limitations, a loss on the sale or exchange (including a transaction treated as a sale or exchange), of "section 1244 stock" which would otherwise be treated as a loss from the sale or exchange of a capital asset shall be treated as an ordinary loss. See sec. 1.1244(a)-1, Income Tax Regs.
"Section 1244 stock" is defined in section 1244(c)(1) as stock in a domestic corporation if (A) at the time such stock is issued, such corporation was a small business corporation, (B) such stock was issued by such corporation for money or other property (other than stock and securities), and (C) such corporation during the period of its 5 most recent taxable years ending before the date the loss on such stock was sustained, derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interests, annuities, and sales or exchanges of stocks or securities. Section 1.1244(c)-1(f)(1)(i), Income Tax Regs., *257 [5] provides special rules applicable to the issuance of section 1244 stock prior to November of 1978, [6] as follows: Pre-November 1978 common stock must have been issued under a written plan adopted by the corporation after June 30, 1958, and on or before November 6, 1978 * * *. This regulation appears to embody the comments of the House Committee which provided that: The stock must have been issued pursuant to a plan to *258 offer not more than a stated dollar amount of stock during a period * * * specified in the plan. Such plan must be in writing and adopted after June 30, 1958. * * * [H. Rept. 2198, 85th Cong., 1st Sess. (1958), 1959-2 C.B. 709, 714. Emphasis added]. Petitioners contend that they should be allowed section 1244 treatment for their RTS stock despite the fact that the RTS Board of Directors never signified formal adoption of such a plan by signing the required documents. We cannot agree. Petitioners have offered little evidence to prove that a section 1244 plan was ever formally adopted by Russell and Cooper. The "plan" submitted into evidence by petitioners is a preprinted form apparently obtained by petitioners' attorney. This form has blank spaces where one is to supply the dollar amount of common stock to be issued, the date the plan was adopted, and the signature of the corporation's secretary. None of these blank spaces have been filled in. RTS' articles of incorporation do refer to section 1244 stock providing that to the extent permitted by law all common stock of the corporation shall qualify as "Section 1244 Stock" within the meaning of section 1244 of the Internal Revenue Code of 1950, *259 as amended, and Treasury Regulations promulgated thereunder.[7] *260 However, the minutes of the organizational meeting of RTS do not make reference to a section 1244 plan. [8] After carefully reviewing the evidence presented, we do not view it as sufficient to support a finding that a section 1244 plan was ever adopted by RTS. The form submitted by petitioners was neither completed nor signed. Moreover, no testimony was presented by either Russell, or Cooper, or RTS' attorney concerning their intent to establish a section 1244 plan for RTS. We therefore find that a section 1244 plan was never adopted by RTS. Accordingly, respondent's determination that petitioners' stock in RTS did not qualify for section 1244 treatment is sustained. [9] See Malinowski v. Commissioner,71 T.C. 1120 (1979); Kaplan v. Commissioner,59 T.C. 178 (1972); Speigel v. Commissioner;49 T.C. 527 (1968); Morgan v. Commissioner,46 T.C. 878 (1966). We next must determine whether petitioners are entitled to a bad debt deduction under section 166(a), or section 166(d), for three obligations owed to them by RTS. The first obligation involves petitioners' claim of a business bad debt for rent not received from RTS but reported by petitioners as ordinary income. The second obligation is a loan of $60,000 made by petitioners to RTS in 1979 for working capital. RTS repaid $16,500 of this loan. The final obligation at issue involves the satisfaction by petitioners in October 1980 of an obligation owed by RTS to a third party of $48,330 which petitioners had guaranteed. Petitioners contend that the obligations paid by them are deductible as business bad debts because petitioners paid the obligations with the expectation that RTS would eventually become a greater source of income to Bonnie. *261 Respondent contends that the obligations paid by petitioners did not give rise to business bad debts but were rather non-business bad debts. [10] Respondent contends that petitioners' true motive in making the loan and satisfying the obligations of RTS was to preserve their investment in RTS. We agree with respondent. Section 166(a)(1) allows as a deduction any debt which becomes worthless within the taxable year. Business bad debts are deductible in the year they become worthless. Non-business bad debts are however treated as a short-term capital loss. Section 166(d)(1). Section 166(d)(2) defines a non-business bad debt as a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. A non-business bad debt is therefore a debt assumed, for example, to preserve one's investment as a shareholder as contrasted with an obligation to protect one's status as an employee, which is a business interest. United States v. Generes,405 U.S. 93, 100 (1972). *262 To determine the character of the obligations at issue herein, we must determine petitioners' motivation at the time the obligations were incurred. Since we are concerned with individuals, the question is whether petitioners' "dominant motive" for making the loan and satisfying the obligations was to protect a business interest, not an investment. [11]Generes,supra at 104. Petitioners' motivation is a question of fact on which they bear the burden of proof. Smith v. Commissioner,60 T.C. 316, 318 (1973). Some factors to be considered in making this determination are (1) the size of the taxpayer's investment; (2) the size of the taxpayer's after-tax salary; and (3) the other sources of gross income available to the taxpayer. United States v. Generes,supra;Scifo v. Commissioner,68 T.C. 714, 723 (1977); Shinefeld v. Commissioner,65 T.C. 1092 (1976). No evidence of the fair market value of petitioners' investment in RTS was presented but it would appear to be substantial. Russell was one of only two shareholders *263 of RTS. The salary earned by petitioners was not substantial in relation to their investment. Russell earned no salary from RTS. Bonnie earned $9,495 in 1978, $15,600 in 1979, and $7,125 in 1980, for a yearly average of $10,740. This amount is further lessened by the impact of taxes. Moreover, petitioners had an additional source of gross income in that they earned rental income in 1978 of $64,067, in 1979 of $39,600, and in 1980 of $39,600. [12] Russell also received income from Russell Short, Inc. during 1978, 1979, and 1980 of $23,400, $26,000, and $29,400, respectively. Bonnie testified that she and Russell obtained a loan of $60,000 in 1979 to provide RTS with additional working capital. She stated that "the business was doing pretty good, but the cash flow was getting short." She obtained an additional loan in October 1980 in order to "keep the business going." Bonnie expressed a desire to keep the business going because she wanted to work. She argues that she wanted to keep RTS going to protect her income source. However our analysis must focus on the objective facts *264 presented and not be swayed by self-serving testimony. United States v. Generes,supra at 104. Accordingly, in light of the fact that petitioners had a substantial investment in RTS, that Bonnie's salary was insubstantial compared to petitioners' other sources of income, and that petitioners had considerable other sources of gross income, we find that petitioners' dominant motivation was to protect their investment. [13] We are further persuaded by the fact that since Russell was one of the two shareholders, Bonnie had little fear of losing her job. Davenport v. Commissioner,70 T.C. 922, 933 (1978). Accordingly, petitioners are not entitled to a business had debt deduction. Respondent's determination on this issue is therefore sustained. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the taxable years at issue.↩
2. Petitioners have conceded by stipulation that they are liable for the additions to tax under sections 6651(a)(1) and (2) for the year 1978 and for the addition to tax under section 6651(a)(2) for the year 1979. However, in Estate of Young v. Commissioner,81 T.C. 879 (1983), this Court held that it does not have jurisdiction to redetermine the addition to tax under section 6651(a)(2) for late payment because it is not attributable to a deficiency. Accordingly our decision in this case cannot redetermine the amount of the addition to tax under section 6651(a)(2) for either year. Respondent concedes that petitioners are allowed deductions for depreciation of $8,418.47 and $6,980.79 in 1980 and 1981, respectively. The parties agree that adjustment (a) of the notice of deficiency is revised as follows: Amount disallowed in
Revised
Year
notice of deficiency
disallowance
1980
$38,966.37
$36,322.42
1981
27,248.16
8,267.20
The parties agree that a loss incurred by petitioners in 1981 on the sale of certain property is $16,337.39, rather than $73,523.59 claimed by petitioners on their return for 1981. Petitioners concede that they received additional interest income in 1980 of $63. Petitioners concede that $36,664.61 of materials and labor deducted in 1981 are not allowable.↩
3. Petitioners also reported gross rental income during the years at issue as follows: ↩
Tax Year
Income
1978
$64,067
1979
39,600
1980
39,600
1981
21,600
4. Petitioners reported a net loss from rentals of various properties for each of those years.↩
5. The validity of section 1.1244(c)-1(f)(1)(i), Income Tax Regs. has been upheld by this Court on several occasions. Malinowski v. Commissioner,71 T.C. 1120, 1126-1127 (1979); Kaplan v. Commissioner,59 T.C. 178, 181 (1972); Spiegel v. Commissioner,49 T.C. 527, 531↩ (1968). 6. Although the record is unclear, respondent's arguments assume that the RTS stock was issued prior to November 1978. Petitioners do not object nor argue otherwise. Sec. 345(c), Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2845, eliminated the requirement in the regulations that sec. 1244 stock be issued pursuant to a written plan. However, such amendment applies only to stock issued after the date of the enactment of such Act (Nov. 6, 1978). See n. 2, Malinowski v. Commissioner,supra↩ at 1127.
7. In their reply brief petitioners argue that the reference to sec. 1244 in the Articles of Incorporation taken with the Form Plan create a sec. 1244 plan. This Court held in Hoffman v. Commissioner,T.C. Memo. 1970-16 that the Certificate of Incorporation there involved did not constitute the requisite written plan. See also Hurd v. Commissioner,T.C. Memo. 1975-6↩. 8. The corporate by-laws included with these minutes are also not signed by Russell.↩
9. We do not address the issue of whether petitioners' basis in the RTS stock came from stock purchases that would qualify for section 1244↩ treatment due to the above holding.
10. Respondent did not challenge petitioners' right to deduct the amounts as non-business bad debts.↩
11. The answer to this question is somewhat befuddled here because Bonnie received a salary but owned no stock while Russell owned one half of the stock but received no salary.↩
12. As previously noted, petitioners reported net rental losses after rather large deductions for depreciation.↩
13. Cf. Hutchinson v. Commissioner,T.C. Memo. 1982-45↩.