RODNEY B. BURTON and PATRICIA L. BURTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burton v. Commissioner
Docket No. 5407-73.
United States Tax Court
T.C. Memo 1975-208; 1975 Tax Ct. Memo LEXIS 156; 34 T.C.M. (CCH) 898; T.C.M. (RIA) 750208; June 30, 1975, Filed D. Alden Newland, for the petitioners. Thomas R. Ascher, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1970 in the amount of $4,496.06 and an addition to tax under section 6651(a), I.R.C. 1954, [1] in the amount of $134.02. *157 The issues for decision are (1) whether advances made by Rodney B. Burton to the Labrana Distributing Company, a partnership, and to its successor, BLK Distributing Company, which upon its incorporation assumed the liabilities of the partnership, were loans or contributions to capital, and, if loans, did they constitute a business bad debt under section 166, deductible as such in 1970; and (2) whether petitioners are liable for the addition to tax for failure to timely file their return. FINDINGS OF FACT Petitioners, husband and wife who resided in Grosse Pointe Park, Michigan at the time their petition in this case was filed, filed a joint Federal income tax return for the calendar year 1970 with the Regional Service Center in Cincinnati, Ohio on April 11, 1972, on the cash method of accounting. Rodney B. Burton (hereinafter referred to as petitioner) is the president of Burton Sohigian, Inc., an advertising firm whose principal office is in Detroit, Michigan. This advertising firm was formed by petitioner and Arthur Sohigian in 1966 and petitioner and Sohigian are the controlling stockholders of the corporation. *158 From 1964 to 1966 petitioner was a free lance market consultant acting as an advertising consultant for a number of accounts such as "Chock Full "O" Nuts," Colgate-Palmolive, Gillette Razor, Canada Dry and other well known firms. From 1950 to 1964, petitioner was employed by the Maxin Advertising Agency and worked on many advertising accounts. One of petitioner's accounts was Phieffer Brewing, which later became known as the Associated Brewing Company. While working on the Phieffer Brewing account, petitioner became acquainted with Antonio Labrana, who was the Detroit city sales manager for Phieffer Brewing and worked with Mr. Labrana in promoting sales of Phieffer beer. The president and founder of the Maxin Advertising Agency was Lou Maxin. Petitioner had a fine relationship with Mr. Maxin which continued until Mr. Maxin had a stroke in 1964 and was no longer able to participate in the business. Mr. Maxin had a personal friendship with Mr. Epstein who was the founder of Phieffer Brewing, and the Phieffer account was a very important account of the Maxin Advertising Agency to its president, Mr. Maxin. In the late fifties or early sixties the distributorship for Phieffer Brewing's *159 beer was owned by Mr. Maxin's son and son-in-law. Their operation had not been extremely successful and Mr. Maxin, who had some investment in their business was anxious to have them dispose of the business. Mr. Maxin asked petitioner if he would get involved in the business so that he could get his son and son-in-law out of it and get back some of the investment he had in it. Mr. Epstein urged petitioner to take over the distribution of Phieffer beer in the Oakland County, Michigan area, for in his opinion this would be assisting petitioner in obtaining a fine business interest and thereby showing some appreciation for the hard work petitioner had done in developing an advertising market for Phieffer Brewing. Petitioner made it clear to both Mr. Maxin and Mr. Epstein that he was not interested in actually operating the distributorship but wanted to remain in the advertising business. Petitioner stated if he did purchase the Oakland County distributorship, he would want to bring in another person to manage the business. In the interim Mr. Labrana had become aware that the Oakland County distributorship for Phieffer beer might be available for purchase. Mr. Labrana was of the opinion *160 that the distributorship could be operated at a profit. Petitioner and Mr. Labrana discussed the possibility of petitioner's purchasing the Oakland County distributorship and their operating it as a partnership. Petitioner purchased the Oakland County distributorship in the late fifties or early sixties for approximately $15,000 and he and Mr. Labrana formed an equal partnership for the operation of the business. The partnership was a Michigan partnership operating under the name Labrana Distributing Company. At approximately the time that petitioner purchased the Oakland County distributorship and formed the partnership for operating the Labrana Distributing Company, regional beer brands such as those handled by Phieffer Brewing and other regional breweries were beginning to lose sales to the nationally known brands such as Budweiser, Schlitz, and Miller's. After the formation of the partnership, efforts were made by petitioner and Mr. Labrana to obtain distribution of other products. The partnership was initially a profitable operation but later began experiencing some difficulties in paying its bills as they fell due and petitioner would sometimes advance funds for its operation. *161 From February 9, 1968 through April 17, 1968, petitioner made the following advances to Labrana Distributing Company: Date
Amount
1968
February 9
$ 1,000
February 28
2,000
February 29
2,000
March 7
3,000
March 8
20,200
March 12
800
March 14
2,000
April 1
3,500
April 2
5,500
April 17
4,000
$44,000 In addition petitioner paid the following obligations of Labrana Distributing Company during this period on the dates indicated: Date
Payee
Amount
1968
February 15
G.M.C. Truck
$1,000.00
March 9
Cash
100.00
March 14
St. Julians Wine Co.
1,950.00
April 12
IRS
1,862.32
$4,912.32
Because of the financial difficulties which were being experienced by Labrana Distributing Company, and in order to bring into the company a third person, Fred R. Kort, petitioner and Mr. Labrana decided to incorporate the business under the name of BLK Distributing Company, hereinafter referred to as BLK. The waiver of notice of the first meeting of the subscribers who were also all of the directors of BLK is dated April 1, 1968, and is signed by petitioner, Mr. Labrana, and Mr. Kort. However, the agreement between individuals *162 to form a corporation, signed by these same three persons, states it is entered into on the 27th day of April 1968. The corporation was actually formed and its articles of incorporation filed with the State of Michigan on April 30, 1968. On April 30, 1968, petitioner and Mr. Labrana signed a document entitled, "Transfer of Assets and Liabilities," which recited in part the following: KNOW ALL MEN BY THESE PRESENTS, that ANTONIO LABRANA and RODNEY BURTON, hereinafter referred to parties of the first part, for and in consideration of the issuance of Two Hundred and Fifty (250) shares of stock in BLK DISTRIBUTING COMPANY, a Michigan Corporation, issued by said Corporation, hereby transfers, grants and conveys, unto said BLK DISTRIBUTING COMPANY, a Michigan Corporation, hereinafter referred to as party of the second part, and its successors, all of the following assets and liabilities: ASSETS
CURRENT ASSETS: Cash on Hand and in Bank
$ 9,668.51
Accounts Receivable Trade
1,328.02
Inventory
37,273.40
Prepaid Expenses
15,049.78
Total Current Assets
$63,319.71
FIXED ASSETS: Delivery Equipment
38,642.99
Warehouse Equipment
613.47
Total
39,256.46
Less Allowance for Depreciation
32,673.35
Total Fixed Assets
6,583.11
OTHER ASSETS: Deposits
2,030.00
Goodwill
11,840.00
Total Other Assets
13,870.00
TOTAL ASSETS:
$83,772.82
LIABILITIES
Notes Payable
$83,772.82
TOTAL LIABILITIES
$83,772.82
*163 Petitioner was given a document entitled "Promissory Note" which showed an amount of $52,219.40 and was dated April 1, 1968, which was signed BLK Distributing Company by Rodney B. Burton, its president, and Fred R. Kort, its secretary-treasurer, which recited as follows: SIXTY (60) months after date, or on demand, BLK DISTRIBUTING COMPANY, a Michigan Corporation, promises to pay to the order of RODNEY BURTON, FIFTY TWO THOUSAND TWO HUNDRED AND NINETEEN DOLLARS AND FORTY CENTS ($52,219.40) payable at 1400 Penobscot Building, Detroit, Michigan 48226. Value received with interest at seven (7%) per cent per annum. Petitioner made four payments of $870.31 each on May 8, October 3, November 6, and December 2, 1968, to the Oakland National Bank on behalf of BLK. Petitioner received a second note from BLK in the amount of $4,000 dated April 30, 1968, which, except as to the dollar amount, was the same as the $52,219.40 promissory note and was signed the same as that note. In 1969, petitioner made the following advances by check to BLK: Date
Amount
1969
January 2
$ 6,167.70
January 24
4,000.00
April 29
2,412.21
April 29
500.00
May 6
3,000.00
October 20
2,000.00
December 4
2,000.00
December 10
2,263.82
Total
$22,343.73
*164 Petitioner received a handwritten note signed, "For B.L.K. A. J. Labrana V.P." dated January 24, 1969, which stated as follows: Received from Rod Burton the sum of $4,000.00 (four thousand). This amount will be added to the present loan made to BLK Distributing Co. by Mr. Burton. This loan ($4,000.00) to be repaid with interest rate of 13% annually. Petitioner received three documents entitled, "Promissory Note," signed, "BLK DISTRIBUTING COMPANY by Rodney Burton, its president, and Fred R. Kort, its secretary-treasurer," reading exactly the same except as to amounts as the note similarly signed previously quoted, on the dates and in the amounts as follows: January 31, 1969
$4,000
July 31, 1969
6,500
October 31, 1969
3,000
Petitioner made the following payments on behalf of BLK to bankers or other creditors on the dates and in the amounts indicated: Date
Recipient
Amount
1969
February 7
Oakland National Bank
$ 870.31
March 6
Oakland National Bank
870.00
March 7
Michigan Bank
104.15
March 10
Connecticut Mutual Life
Insurance Co.
119.01
March 11
City National Bank
300.00
March 12
City National Bank
283.24
March 31
Cash (IRS taxes)
1,150.00
August 9
Connecticut Mutual Life
Insurance Company
119.01
October 28
Advertising
125.00
December 3
Michigan Bank
104.15
December 3
Michigan Bank
195.01
December 6
City National Bank
283.24
December 6
First Federal of Detroit
336.00
December 9
Michigan Bank
106.44
*165 On February 2 and April 7, 1970, petitioner made advances to BLK in the amounts of $2,000 and $1,500, respectively. On January 10 and January 26, 1970, petitioner paid equipment loans for BLK in the amounts of $195.01 and $349.44, respectively; and on March 31, 1970, April 6, 1970, and April 9, 1970, made payments in the amounts of $4,250.00, $4,263.81, and $3,000.00, respectively, for beer to be delivered to BLK. On February 6, 1969, petitioner paid an attorney fee for BLK in the amount of $1,570. BLK was unable to obtain bank loans without the personal endorsement of its stockholders, but it did obtain certain loans from the Oakland National Bank which were endorsed by petitioner, Mr. Labrana, and Mr. Kort. When Labrana Distributing Company was initially formed Mr. Epstein wanted it to distribute only Phieffer beer, but later the partnership and BLK throughout its existence attempted to obtain the distribution of national brands of beer or some other form of beverage such as wine for the operation, and Associated Brewing Company attempted to assist BLK to obtain distribution of a national brand of beer. Petitioner was of the opinion that a national brand of beer or some *166 other beverage for distribution was necessary in order for BLK to operate at a satisfactory profit. In 1969 when BLK had not been successful in obtaining any brands other than the Associated Brewing Company's brands, petitioner began negotiating in an effort to sell the company. The attorney for Burton Sohigian, Inc., attempted to help petitioner work out some form of sale, and petitioner had the agreement of Associated Brewing Company to work out an arrangement for the purchase of BLK by Mr. Kort, if possible. Mr. Kort was desirous of purchasing BLK because he was of the opinion he could profitably operate the business. He had lined up a possible wine distributorship and also another brand of beer to distribute. Mr. Kort's mother-in-law was to put up the collateral for a loan to Mr. Kort to purchase the business. All the details had been worked out in early 1970, but on the day the sale was to be made Mr. Kort's mother-in-law refused to put up the collateral. Petitioner wanted BLK sold to Mr. Kort because Mr. Kort would have assumed BLK's liabilities and petitioner believed Mr. Kort could make the business successful and that it was a good business opportunity for Mr. Kort. Associated *167 Brewing Company was satisfied with Mr. Kort as a distributor. In June of 1970, the assets of BLK were sold to a Mr. Cousins for $20,000. The sale was arranged by Associated Brewing Company with the understanding that Mr. Cousins would continue to distribute Associated Brewing Company's beer. Mr. Cousins did continue to distribute this beer and also obtained the distribution of national brands of beer, and at the time of the trial in 1974 was still operating the distributorship. On December 27, 1970, petitioner paid to BLK's accountant an amount of $1,800 which BLK had owed to the accountant and had not been paid. He also paid to the attorney for BLK $4,922 on October 1, 1970. Of the proceeds of the sale of the assets, $12,000 was paid to IRS to partially discharge the withholding tax liability of BLK and the remaining $8,000 was paid to BLK's attorney as payment of legal fees for the year 1970. At the time the assets of BLK were sold and BLK ceased to exist as a viable corporate entity, it had an indebtedness to the Oakland National Bank on which petitioner was a guarantor along with Mr. Labrana and Mr. Kort. On December 21, 1970, an arrangement was made with the bank whereby *168 petitioner assumed the sole obligation for $40,540.38 of the BLK liability to the bank, and Mr. Labrana and Mr. Kort each assumed the sole obligation for lesser amounts of BLK's indebtedness to the bank. Petitioner gave the Oakland National Bank his note for the $40,540.38 that he assumed of BLK's indebtedness to the bank and paid no amount on the $40,540.38 liability he assumed in the year 1970 but since that date has made, and at the time of the trial was continuing to make, payments on this liability. Petitioner spent very little time personally with BLK. During the years 1964 through May of 1966, when he was operating as a consultant for advertising matters, he spent most of his time in New York. After the organization of Burton Sohigian, petitioner worked long hours for that corporation. Burton Sohigian represents a number of nationally known concerns such as Fruehauf Trailer, McDonalds, and large local concerns such as the National Bank of Detroit. Associated Brewing Company and its successor, G. Heilmann Brewing Company, were important accounts to Burton Sohigian. During the years from 1966 through and including 1973, Burton Sohigian received billings in the following amounts *169 from Associated Brewing Company or its successor: Year
Amount
1966
$ 12,000.00
1967
98,000.00
1968
240,711.26
1969
796,862.12
1970
1,131,086.80
1971
2,311,147.91
1972
2,289,311.17
1973
2,157,431.10
Total
$9,036,550.36
The billings are the total advertising placed through an advertising agency on which the agency receives commissions. BLK filed its tax returns on a fiscal year basis ending March 31. Its returns for each of its fiscal years 1969 and 1970 were signed by Mr. Kort, the 1969 return designating him as treasurer and the 1970, as president. BLK's corporate income tax return for 1969 reported a loss of $6,495.29. Its balance sheet showed the following as its assets and liabilities at the end of its taxable year: ASSETS
Cash
$ 8,550.27
Inventories
30,689.32
Other current assets (prepaid expenses)
27,176.82
Loans to stockholders
30,307.37
Buildings and other fixed
depreciable assets
$39,256.46
Less accumulated
depreciation
38,133.24
1,123.22
Other assets (deposits
and goodwill)
14,870.00
Total assets
$112,717.00
LIABILITIES AND STOCKHOLDERS' EQUITY
Accounts payable
$ 2,925.00
Mortgages, notes, bonds payable
in less than 1 year
14,237.79
Other current liabilities (Taxes)
33,066.20
Mortgages, notes, bonds payable
in 1 year or more
58,267.50
Other liabilities (customers
deposits)
3,213.80
Capital stock: Common stock
7,500.00
7,500.00
Retained earnings--Unappropriated
(6,495.29)
Total liabilities and
stockholders' equity
$112,717.00 [sic]
*170 BLK's income tax return for its fiscal year 1970 reported a loss of $37,337.75. The balance sheet of this return showed the following assets and liabilities as of the beginning and end of the fiscal year: Beginning of taxable year
End of taxable year ASSETS
Amount
Total
Amount
Total
Cash
$8,550.27 $
Trade notes and accounts
receivable
$ 7,799.22
Less allowance for bad debts
$ 7,799.22
Inventories
9,775.48
1,482.52
Due from partners and stock-
holders
59,625.02
Other current assets (prepaid
expenses)
14,687.86
1,929.72
Buildings and other fixed de-
preciable assets
$12,488.11
19,466.15
Less accumulated depreci-
ation
2,770.32
9,717.99
5,981.24
13,484.91
Intangible assets (amortiza-
able only) Deposits
2,030.00
2,158.00
Less accumulated
amortization
(illegible)
(illegible)
2,158.00
Total assets
$86,479.39
LIABILITIES AND STOCKHOLDERS EQUITY
Accounts payable
2,025.00
8,717.32
Mortgages, notes, bonds payable
in less than 1 year
6,832.71
14,383.44
Other current liabilities
(accrued taxes and deposits)
30,816.66
32,040.40
Loans from stockholders
4,669.21
Mortgages, notes, bonds payable
in 1 year or more
(illegible)
60,005.73
Capital stock: Common stock
7,500.00
7,500.00
Retained earnings--Unappropriated
(Deficit)
(327.75)
(36,167.50)
Total liabilities and stockholders'
equity
$52,413.73
$86,479.39
*171 Petitioner, Mr. Labrana, and Mr. Kort were each shareholders in BLK. They had the understanding that the amounts advanced by petitioner to pay the bills of BLK, as well as amounts directly advanced to BLK, would be repaid to petitioner if BLK became profitable. Arthur Sohigian who was a co-founder of Burton Sohigian with petitioner and also a major stockholder was not asked to and did not make any loans to BLK, and Burton Sohigian, Inc., as a corporation made no such loans to BLK. The continued operation of an Oakland County distributorship for the beer of Associated Brewing Company was extremely important to that company. BLK distributed approximately 25 percent of the Associated Brewing Company's beer sales in the Detroit Metropolitan area. At times petitioner would request of the other officers of BLK, and of Mr. Labrana when the predecessor partnership was operating, that some portion of his advances be repaid. Some small amounts of advances made by petitioner to the Labrana Distributing Company were repaid, but petitioner was never reimbursed for any advances to BLK. In petitioner's opinion, if he had attempted to collect his advances to Labrana Distributing Company and *172 BLK all at once, it would have thrown the operation into bankruptcy. Both petitioner's accountant and attorney advised him against making advances to Labrana Distributing Company and to BLK but when petitioner nevertheless made such advances, petitioner's attorney who was also the attorney for BLK suggested that the promissory notes be prepared and given to petitioner. It was this attorney who had prepared the corporate minutes for BLK and the other documents pertaining to the formation of the corporation. The corporate minutes as prepared by this attorney contained a recital with respect to the $52,219.40 promissory note being given to petitioner. This attorney prepared the promissory notes to petitioner, except for a promissory note for $4,000 dated January 24, 1969. The attorney for BLK suggested that petitioner should have the controlling interest of the corporation, but petitioner ignored this advice and took a minority interest. An officer of the Associated Brewing Company had several times indicated to petitioner that it was important to the Associated Brewing Company that BLK continue to operate and distribute Associated Brewing Company brands in the Detroit area and had *173 urged petitioner to take a stronger management role in the company. The original accountant for BLK withdrew because of BLK's failure to pay him and the accountant that took over thereafter for BLK was deceased at the time of the trial of this case. Petitioner on his Federal income tax return for the calendar year 1970 reported as income, salary of $26,000 from Burton Sohigian, Inc., and claimed a loss of $115,583 with the following explanation: The following is a list of debts created or acquired in connection with the taxpayers' trade or business, the worthlessness of which were incurred in the taxable year 1970. Loans made to BLK Distribut-
ing Co.
$ 65,000
Debts acquired of BLK
Distributing Co.
40,813
Legal and accounting expenses
9,770
Total - Page 2 - Line
39 - Form 1040
$115,583
Respondent in his notice of deficiency disallowed this claimed deduction of $115,583 with the following explanation: The deduction of $115,583.00 for bad debts has been considered to be a non-business bad debt in accordance with the information and verfication submitted and is limited to a deduction of $1,000.00. Respondent also determined an addition to tax of $134.02 *174 for petitioner's failure to timely file his return for the calendar year 1970. This addition to tax is 25 percent of the underpayment of tax, $3,960 of tax having been paid by petitioner through withholding. OPINION Although the notice of deficiency which respondent sent to petitioner disallowed the claimed deduction for bad debt solely on the basis that it was a nonbusiness bad debt with the deduction limited to $1,000, at the trial both respondent and petitioner raised an issue with respect to the total amount of the advances which petitioner had made to or on behalf of the Labrana partnership and BLK, and respondent also raised the issue of whether petitioner's advances to the partnership and BLK were loans or contributions to capital. Neither party objected to these issues being outside the scope of the pleadings and therefore we view these issues as issues tried by consent within the meaning of Rule 41(b)(1) of the Rules of Practice and Procedure of this Court. We will therefore, in accordance with the provisions of that rule, treat these issues in all respects as if they had been raised in the pleadings. We have in our findings disposed of the factual issue of the amount *175 of advances petitioner made to or on behalf of the Labrana Distributing Company and BLK. This issue is purely factual and based on the findings we have made we conclude that petitioner made advances to and payments on behalf of the partnership and BLK in 1968 in the total amount of $53,393.56 and made advances to and payments on behalf of BLK in 1969 in the total amount of $27,309.30, and in 1970 made advances to and payments on behalf of BLK prior to the time that its assets were sold to Mr. Cousins of $16,128.26 including a payment to BLK's attorney on February 6, 1969, of $1,570. We further have found and conclude that after the sale in June of 1970 petitioner paid BLK's accountant $1,800 and its attorney $4,922 for services that the accountant and attorney had previously rendered to BLK. In addition to the above amounts, petitioner assumed $40,540.38 of BLK's indebtedness to the Oakland National Bank and in so doing was released from his liability as guarantor on amounts of BLK's indebtedness to the bank assumed solely by Mr. Labrana and Mr. Kort. We have also found that petitioner gave his note to the Oakland National Bank for the $40,540.38 of liability which he assumed for *176 BLK but made no payments on this note during the year 1970. Petitioner argues that the evidence does not show that petitioner substituted his note for a portion of the BLK note on which he was guarantor but in our view the evidence does support this fact and we have so found. It is clear from this record that the advances which petitioner made to and on behalf of the partnership and BLK, whether or not they were loans, became totally worthless in 1970. To the extent the advances represented loans which became worthless they are deductible as business bad debts only if petitioner has shown that the loans were proximately related to his trade or business. Stuart Bart,21 T.C. 880 (1954). [2] To the extent that the advances were not loans, their worthlessness results in a capital loss unless petitioner can show that the advances were not in fact contributions to capital but were made for purposes of his trade or business and therefore are deductible as ordinary and necessary business expenses. James O. Gould, 64 T.C. (May 1, 1975). *177 The record is clear that the indebtedness of BLK assumed by petitioner in 1970 through subrogation constitutes an indebtedness of BLK to petitioner and therefore, if deductible at all, must be deductible as a bad debt loss. Putnam v. Commissioner,352 U.S. 82 (1956). The parties have devoted much of their argument to whether the advances by petitioner to the partnership and BLK were loans or capital contributions. In our view, the facts show that the amounts petitioner advanced to the partnership and the amounts initially advanced to BLK were loans but after approximately the middle of 1969, when petitioner had actively begun to make an attempt to sell BLK in such a manner as to recover both BLK's indebtedness to him and his investment in BLK, the amounts advanced were not loans. We therefore conclude that the $52,393.56 of advances to BLK and payments of BLK's obligations in 1968 by petitioner were loans by petitioner to BLK and that $19,776.62 of similar advances and payments on behalf of BLK in 1969 were loans and that the balance of petitioner's advances in 1969 and all of his advances in 1970 were not loans. Whether advances by a taxpayer to a corporation *178 in which he owns stock are loans is a question of fact to be determined from all the evidence in the case. As was pointed out in Fin Hay Realty Co. v. United States,398 F. 2d 694 (3rd Cir., 1968), no single criterion nor any series of criteria can provide a conclusive answer to whether advances are loans and the various factors considered in the many cases on this subject are merely aids in answering whether the economic realities of the transaction more nearly resemble a debtor-creditor relationship or that of investor. In the instant case petitioner was only one of two partners in the Labrana Distributing Company and held only one-third of the stock in BLK. When it began operations the partnership had made some profit and both Mr. Labrana and petitioner believed that after its incorporation it would be able to operate successfully. The corporation assumed the indebtedness of the partnership to petitioner and issued notes to petitioner covering this indebtedness. It was the testimony of all parties involved in BLK and the two partners in the Labrana Distributing Company that it was the intent that petitioner be repaid for these advances even though it was apparent *179 that there were no funds with which to make repayment unless the business could be put on a profitable basis. As was pointed out in the case of Milton Falkoff,62 T.C. 200, 206 (1974), even a note payable only from a designated source may constitute a valid debt. The notes to petitioner were, of course, not limited to payment from profit but were ordinary notes. However, the form of the transaction is not controlling but rather its substance. Gilbert v. Commissioner,262 F. 2d 512 (2d Cir., 1959), affirming a Memorandum Opinion of this Court. Any indebtedness is to some extent, dependent on the profits of the business to which the loan is made since this is the most likely source of repayment of a loan and there is often some element of risk in any loan. Fin Hay Realty Co. v. United States,supra.
From the facts in this record and considering the evidence of the financial condition of BLK as well as the testimony of the witnesses, we have concluded that initially and until the middle of 1969, petitioner's advances to the partnership and to BLK were in substance as well as form loans. Although BLK did not have a profit for its *180 fiscal year ended March 31, 1969, its loss was only approximately $6,500 and certainly up to the middle of 1969 the facts were such that petitioner might reasonably expect BLK to become a profitable organization and might reasonably expect repayment of his advances. After that date it had become increasingly evident that BLK could not be successful without obtaining the distributorship of a national brand of beer and petitioner had decided to attempt to sell BLK so as to recover his advances to the business and his investment in the business. At that juncture it should not have been and in fact the evidence shows was not petitioner's expectation to obtain repayment in any manner except through a sale of BLK. At this juncture BLK was experiencing difficulty in obtaining loans from banks. Petitioner was no longer being given notes for his advances. It was becoming increasingly apparent that there was very little likelihood that petitioner would be repaid for any advances other than through a sale of his interest in BLK and in our view no true loan was intended by petitioner for any advances made by petitioner to BLK after the middle of 1969. The determinative factor as to whether an *181 advance to a corporation is a loan is the real intention of the parties. Smith v. Commissioner,370 F. 2d 178 (6th Cir., 1966), affirming a Memorandum Opinion of this Court. Here the evidence shows that the real intention of the parties up until the middle of 1969 was that the advances were loans and thereafter it was not. There is one further preliminary question before we reach the major issues between the parties. Respondent points out that since petitioner is a cash basis taxpayer and made no payments on the $40,540.38 note which he gave to the Oakland National Bank when he assumed sole responsibility of this amount of the indebtedness of BLK to the bank, he is in no event entitled to a deduction for this amount in the year here in issue. As we pointed out in Donald M. Perry,49 T.C. 508, 521, 522 (1968): The rule is well established that when a cash basis taxpayer gives a note to satisfy an obligation, a deductible expense does not arise under the income tax laws until the note is paid. Helvering v. Price,309 U.S. 409; Eckert v. Burnet,283 U.S. 140, 141; Baltimore Dairy Lunch v. United States,231 F. 2d 870, 875. *182 Furthermore, the rule has been applied to section 166, bad debt deductions. The courts have not allowed a cash basis taxpayer a deduction for the amount of an unpaid note given to a creditor to evidence taxpayer's intention to fulfill his obligation as guarantor for a third party. This is true even though the note is secured by the taxpayer's property and there is no prospect of the taxpayer-guarantor recovering from the primary obligor. * * * The situation here with respect to the $40,540.38 note given by petitioner to the Oakland National Bank because of his guarantor liability of a note of BLK comes squarely within our holding in Donald M. Perry,supra, as quoted above. Therefore, petitioner is not entitled to a deduction either as a business or nonbusiness bad debt for the $40,540.38 of BLK's indebtedness to the bank which he assumed until the year in which he makes payments on his note to the bank. However, after eliminating the $40,540.38 which was not paid by petitioner in the year before us, there remains $72,170.18 of indebtedness of BLK to petitioner which became worthless in 1970 and an amount of $30,552.94 which petitioner advanced to or on behalf of BLK in *183 the last half of 1969 and in 1970 which became worthless in 1970. It is therefore necessary for us to resolve the major issue between the parties which is whether these loans by petitioner to BLK and other advances of petitioner to BLK were proximately related to a trade or business of petitioner so as to be deductible as a business bad debt and a business expense. If they were not so proximately related to petitioner's trade or business, the loans are deductible only as a nonbusiness bad debt and the other advances only as a capital loss. Petitioner contends that he advanced money to the partnership and BLK to protect his career and his relationship with Associated Brewing Company as a client of Burton Sohigian, Inc. Petitioner argues that at the very time BLK needed advances, Burton Sohigian, Inc., was struggling to maintain its existence as an advertising firm and petitioner had no alternative but to advance sums to BLK since he could not turn his back on Associated Brewing as a source of business for his career. He states that had he done so, it might have been that both Burton Sohigian and petitioner would have been forced into some kind of insolvency or bankruptcy proceedings. *184 Petitioner cites a number of cases in which we have concluded that loans or investments in businesses by a taxpayer were proximately related to the taxpayer's business and therefore upon becoming worthless were deductible either as a business bad debt or a business loss. Cubbedge Snow,31 T.C. 585 (1958), and Allen v. Commissioner,283 F. 2d 785 (7th Cir., 1960), affirming in part and reversing in part a Memorandum Opinion of this Court. As we pointed out in Oddee Smith,60 T.C. 316 (1973), since the decision of the Supreme Court in United States v. Generes,405 U.S. 93 (1972), it is settled that in order to be entitled to deduct a bad debt as a business bad debt, a taxpayer must show that his dominant motivation in advancing the funds which gave rise to the debt was to protect his own business. In the Generes case, the Supreme Court pointed out the dual status of a taxpayer relative to a corporation where the taxpayer is both a shareholder and employee, stressing the fact that the interests are not the same since the taxpayer's status as a shareholder is an investment or nonbusiness interest and a loss with *185 respect thereto is capital in nature, whereas his status as an employee or in his own business is a business interest and a loss proximately connected therewith is deductible. The Court then pointed out the necessity of determining the factual question of whether a debt or investment that went bad centered on the taxpayer's business interest or nonbusiness interest, and held that in order to show that the debt was proximately related to his business, the taxpayer must show that the dominant motivation in making the advance was to protect his business interests. In reaching this conclusion, the Court stated at 405 U.S. 104: As has just been noted, an employee-shareholder, in making or guaranteeing a loan to his corporation, usually acts with two motivations, the one to protect his investment and the other to protect his employment. By making the dominant motivation the measure, the logical tax consequence ensues and prevents the mere presence of a business motive, however small and however insignificant, from controlling the tax result at the taxpayer's convenience. This is of particular importance in a tax system that is so largely dependent on voluntary compliance. *186 In the Generes case the Supreme Court referred to Whipple v. Commissioner,373 U.S. 193 (1963), in which the Court had distinguished between the business of a corporation and the business of the shareholder of a corporation. The Court there pointed out that since full-time service to one corporation does not in itself amount to a trade or business, the same services to many corporations would likewise not amount to a trade or business unless the taxpayer showed that he was in the trade or business of promoting corporations for a fee or commission. The Court further pointed out that this Court had held that the taxpayer in the Whipple case was not engaged in the trade or business of money lending or of financing corporations and that the taxpayer had not claimed that the loans there made were in connection with his work or trade or business as a corporate executive for a salary as was the situation in Trent v. Commissioner,291 F. 2d 669 (2d Cir., 1961), reversing 34 T.C. 910 (1960). Petitioner in this case has not contended that he was in the trade or business of financing corporations nor has he contended that advances made *187 to the partnership and to BLK were for the purpose of protecting his employment as the president of Burton Sohigian, Inc. All of the advances here involved were made from 1968 through 1970 when petitioner was president of Burton Sohigian, Inc. It would be necessary for petitioner to show a proximate connection of the loans and advances to some trade or business in which he was personally engaged during the years 1968 through 1970 as distinguished from the business of Burton Sohigian in order for petitioner to show that his advances to the partnership and BLK were proximately related to his business. As we pointed out in Estate of Martha M. Byers,57 T.C. 568, 578 (1972), affirmed per curiam 472 F. 2d 590 (6th Cir., 1973), it is well established that where a taxpayer does business in a corporate form, there is not such a blending of the corporation's business and that of its stockholders so that loans made to protect a corporate business of which the taxpayer is a stockholder and officer could be considered to be payments for protection of the taxpayer's own business. Therefore, even if we could find, on the basis of this record that petitioner's advances *188 were for the purpose of protecting the business of Burton Sohigian, Inc., it would not follow that these advances would be deductible as business bad debts or business losses by petitioner. Whipple v. Commissioner,supra.
On this record, in our view, the facts show that the advances made by petitioner were motivated by a desire to protect his investment and were not business related. When petitioner initially invested in the partnership, he was an employee of the Maxin Advertising Agency and his own testimony shows that it was because of the suggestion of Mr. Maxin whose son and son-in-law were operating a business distributing the beer of Phieffer Brewing Company, and at the urging of Mr. Epstein who thought the obtaining of a distributorship for Phieffer beer in the Oakland area would be a profitable undertaking for petitioner that petitioner made his initial investment. Although the Phieffer Brewing Company was a client of petitioner's corporate employer and Mr. Epstein, his personal friend, its president, there is no showing of any relationship of petitioner's initial investment to any trade or business of petitioner. When the partnership was experiencing *189 some financial difficulties and petitioner made advances to it, the indications from this record are that those advances were made to keep the business operating with the hope of obtaining national brands of beer for distribution and making the distributorship a profitable operation. Petitioner's loans later in that year to the corporation were likewise to protect the investment he had in the beer distributing business with the hope of that business becoming a profitable operation for him. His motivation for the advances remained the same in the early part of 1969 and in the latter part of that year, and in 1970 he was continuing to advance money to the corporation with the hope of selling the business for a sufficient sum to recoup his investment or at least to reduce his losses. Although the record is not completely clear, apparently the two payments petitioner made on behalf of BLK after the business was sold to Mr. Cousins were because of a commitment he had made to the accountant and lawyer for BLK prior to the time the business of BLK was sold. While we do not doubt that Associated Brewing Company was an important client of Burton Sohigian, Inc., in our view, this record totally *190 fails to show that petitioner's failure to make loans or capital contributions to the partnership or to BLK would have caused Associated Brewing Company not to remain a client of Burton Sohigian, Inc., or have caused that company to reduce the advertising it placed through Burton Sohigian, Inc. Likewise, the record does not show that petitioner in fact thought his failure to make loans to BLK or its predecessor would have caused a discontinuance of or reduction in the advertising business Burton Sohigian received from Associated Brewing. On the basis of this record as a whole, we conclude that petitioner's dominant motivation in making advances to the partnership and to BLK was not proximately related to a trade or business of his as distinguished from being investment motivated. We therefore hold that petitioner's loans to the partnership and BLK which became worthless in 1970 were nonbusiness bad debts and his advances which were not loans were capital contributions which resulted in a capital loss to petitioner in 1970. Petitioner, on brief, makes an alternative argument that if it is considered that petitioner's advances to BLK were, in total or to any extent, contributions *191 to capital, then $47,500 of those advances should be deductible as ordinary losses on section 1244 stock. Petitioner points out that his 250 shares of BLK stock were section 1244 stock and that he was allowed an ordinary loss deduction for the $2,500 par value of that stock in 1970. Respondent takes the position that no issue with respect to section 1244 was raised in the pleadings or at any time prior to petitioner's original brief in this case and that under our holding in Sidney Messer,52 T.C. 440, 455 (1969), aff'd. 438 F. 2d 774 (3rd Cir., 1971), this Court will not consider issues raised for the first time on brief. Respondent further argues that petitioner is wrong on the merits of the section 1244 issue since there is nothing in this record to show that the advances by petitioner to BLK which amount to capital contributions were made pursuant to any plan within the meaning of section 1244 and to allow such advances to be consideerd ordinary losses under section 1244 would violate the purposes of that section, citing William Siebert, Sr.,53 T.C. 1 (1969). We do not reach respondent's argument on the merits of petitioner's *192 section 1244 issue since we agree with respondent that this issue was not raised by the pleadings or at the trial but was raised by petitioner for the first time in his brief. Rule 34(b)(4) and (5) of the Rules of Practice and Procedure of this Court require that the petition contain clear and concise assignments of each error on which the petitioner relies and clear and concise statements of fact. Petitioner has alleged no error and stated no facts in the petition with respect to section 1244. Also there was no evidence offered at the trial other than petitioner's 1970 return showing a $2,500 deduction for loss on section 1244 stock, to indicate that section 1244 would in any way be applicable to this case. What might have been the evidence in the case by petitioner or respondent had this issue been raised prior to or at the trial, we do not know and therefore we do not consider the issue properly before us. Petitioner on brief argues that his failure to timely file his return for the year 1970 was due to advice of his accountant and therefore respondent's addition to tax under section 6651(a) for failure to timely file should not be sustained. Petitioner has the burden of proving *193 that his failure to timely file his return was due to reasonable cause and not to willful neglect. See C. Fink Fischer,50 T.C. 164, 177 (1968). Here petitioner has offered no evidence to support his claim that his failure to timely file was due to reliance on advice of his accountant or any other evidence to show reasonable cause for his failure to timely file. We therefore sustain respondent in his determination of addition to tax for failure to timely file. Decision will be entered for respondent.
Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. Sec. 166(a) and (d) provides: SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩