SAMUEL G. MILLER and JEAN D. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 2667-86.
United States Tax Court
T.C. Memo 1989-153; 1989 Tax Ct. Memo LEXIS 153; 57 T.C.M. (CCH) 46; T.C.M. (RIA) 89153; April 10, 1989. C. Christopher Trower and Scott W. Dolson, for the petitioners. Andrew M. Winkler, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF *154 FACT AND OPINION WRIGHT,Judge: By a notice of deficiency dated November 18, 1985, respondent determined a deficiency in petitioners' Federal income tax in the amount of $ 41,952.45 for taxable year 1980. After concessions, the sole issue for our consideration is whether petitioners are entitled to claim an ordinary loss with respect to small business stock pursuant to section 1244. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioners resided in Louisville, Kentucky, at the time of filing the petition herein. Petitioners, husband and wife, timely filed a joint income tax return for 1980 with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner Samuel G. Miller (hereafter petitioner) organized a corporation, Sam Miller Enterprises, Inc. (SME or the corporation), under the laws of the State of Kentucky on January 10, 1979. At all times, *155 petitioner was the sole shareholder, the sole director and president of SME. SME was organized to purchase licenses to establish and operate hair cutting salons under a "Command Performance" franchise in Kentucky, Tennessee and South Carolina. Petitioner and two colleagues, William Allen (Allen) and Paul Logsdon (Logsdon) organized three corporations (the subsidiary corporations) to operate the hair salons. SME owned 51 percent of the outstanding stock in each subsidiary corporation with the remaining shares of stock owned equally by SME, Allen and Logsdon. Both Allen and Logsdon had experience managing hair cutting salons although petitioner did not. The parties agreed that when profits exceeded costs SME, Allen and Logsdon would become equal one-third shareholders in each of the three subsidiary corporations. In addition to holding a majority interest in each of the three subsidiary corporations, SME separately owned a hair cutting salon holding a "Command Performance" franchise in Decker Mall (the Decker Mall salon) in Columbia, South Carolina. On January 23, 1979, petitioner paid $ 150,000, which he had borrowed from Citizens Fidelity Bank, to SME and was issued 150 shares *156 of the 2,000 shares of common no-par stock which was authorized. SME purchased the franchising licenses for $ 150,000 and transferred them to the subsidiary corporations. The corporate minutes from the initial organizational meeting indicate that $ 135,000 of petitioner's first transfer of $ 150,000 to SME was characterized as a loan to the corporation although there was some evidence that the decision to reclassify the stock purchase was not made until May of 1979. On January 17, 1979, petitioner paid SME with two separate checks, one for $ 15,000 marked as equity and one for $ 135,000 marked as promissory note. [2] Well after the actual contribution, petitioner received a promissory note for $ 135,000. [3]
*157 The working capital necessary to equip and fund the operation of the subsidiary corporations' hair salons and the Decker Mall hair salon was provided, as needed, by payments from petitioner to SME. Over the course of the operation of the salons, petitioner made total payments of $ 395,740.61. Each transfer was recorded in SME's corporate books as a loan from petitioner and evidenced by a promissory note. Similarly, each time SME advanced cash to the three subsidiary corporations it received promissory notes in exchange. Petitioner believed that he would be unable to obtain outside financing for the necessary working capital because hair cutting salons were considered too risky so he did not try. The terms of the promissory notes petitioner received were identical. Principal was payable on demand, no collateral was pledged and interest was set at the rate of one percent over prime. [4]SME did not maintain a reserve fund for paying the notes and had no other assets beyond those purchased for the operation of the Decker Mall salon and the stock of the three subsidiary corporations. During 1980, SME paid petitioner $ 14,612.82 in interest and $ 5,469.38 in principal. SME also *158 paid $ 21,243.70 to the Citizens Fidelity Bank as interest on the personal loan of $ 150,000 that petitioner obtained to purchase the licenses. The three subsidiary corporations paid principal and interest to SME on the advances they had received in the amounts of $ 30,756.58 and $ 17,831.99, respectively. By 1981, petitioner determined that the "Command Performance" hair cutting salons would not be profitable. The salons run by the three subsidiary corporations never produced enough revenue to pay their own expenses, and although the Decker Mall salon produced some revenue, high expenses precluded the realization of profit. All of the proceeds SME received were generated by the Decker Mall salon. SME had no profits in 1979 or 1980. On September 24, 1980, SME filed a corporate resolution requesting dissolution of the corporation from the State of Kentucky. On December 31, 1980, SME transferred all of its assets and liabilities to petitioner. On March 4, 1981, the promissory notes SME had executed payable to petitioner were *159 reclassified on the corporate books as common stock, increasing the capital stock account from $ 15,000 to $ 410,740.61. Dissolution was authorized on April 21, 1981. On his 1980 income tax return, petitioner claimed a loss of $ 290,606, the excess of the capital account of $ 410,740.61 over the liquidating distribution of $ 120,135. The franchise licenses were not resold after the corporation failed. OPINION The sole issue for our consideration is whether petitioners were entitled to claim a ordinary loss of $ 100,000 for their stock in SME under section 1244. Subject to certain limitations, section 1244 allows a taxpayer to treat a loss on section 1244 stock issued to the taxpayer as an ordinary loss rather than a loss from the sale or exchange of a capital asset. Section 1244 stock is defined as common stock issued in exchange for money or other property by a domestic small business corporation, 50 percent of whose income does not come from investment activity. Sec. 1244(c)(1). In order for a transfer to create section 1244 stock, stock must actually be issued to the contributor. If capital is contributed without a corollary transfer of stock, the transferor does not *160 receive section 1244 stock nor does he increase his basis in the section 1244 stock he already owns. Sec. 1244(d)(1)(B); sec. 1.1244(c)-1(b), Income Tax Regs. The technical requirements of section 1244(c)(1) must be satisfied at the time that the alleged section 1244 stock is issued. Kaplan v. Commissioner,59 T.C. 178, 183 (1972). Respondent challenges only whether petitioner's interests in SME constituted section 1244 stock. Respondent first argues that almost all of the advances petitioner made to SME in exchange for the promissory notes were not reciprocated with transfers of stock. However, respondent concedes that if the interest petitioner received is stock it qualifies as section 1244 stock. With respect to the single transaction in which petitioner received stock, respondent maintains that because petitioner and SME originally characterized the initial contribution of $ 150,000 as a payment for stock of $ 15,000 and a transfer of loan proceeds of $ 135,000, petitioner cannot now argue that he paid any more than $ 15,000 for his stock. In the alternative, respondent contends that if the transfers did create an equity interest for petitioner, that interest *161 would be properly characterized as preferred stock or as a contribution to capital rather than as common stock. Petitioner argues that the promissory notes taken from SME as evidence of each advance payment do not reflect a debt obligation but an equity interest. Although the notes are, on their faces, straightforward debt instruments, petitioner contends that the economic substance of the transactions contains stronger and more compelling indicia of equity than of debt and the instruments should be characterized as stock for tax purposes. Similarly, petitioner contends that his initial contribution to SME of $ 150,000 should be taken as a full payment for the 150 shares of stock he received rather than as creating a debt of $ 135,000 which the later attempts to restructure the transaction would indicate. Petitioners bear the burden of proof on all issues. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Despite consideration by the Secretary since 1969 [5] and by the courts for decades, there are no uniform standards to resolve the debt-equity issue and each case must depend upon its own individual facts. John Kelley Co. v. Commissioner,326 U.S. 521 (1946). *162 Debt has been defined as "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or the lack thereof." Gilbert v. Commissioner,248 F.2d 399, 402 (2d Cir. 1957). Equity, on the other hand, reflects the "shareholder's intention * * * to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit." United States v. Title Guarantee & Trust Co.,133 F.2d 990, 993 (6th Cir. 1943). The fundamental inquiry is whether the parties had a genuine intention to create a debt, with a reasonable expectation of repayment and was that intention reflected in the economic reality surrounding the transaction. Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377 (1973). *163 The Sixth Circuit, to which appeal lies in this case, [6] articulated several factors to be used in evaluating the debt and equity characteristics of a shareholder's interest. Roth Steel Tube Co. v. Commissioner,800 F.2d 625, 630 (6th Cir. 1986), cert. denied 481 U.S. 1014 (1987), affg. a Memorandum Opinion of this Court. These factors are: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. (Citations to cases omitted.) *164 No single factor is dispositive and we must consider all of the facts and circumstances of each case. Smith v. Commissioner,370 F.2d 178, 180 (6th Cir. 1966). Characteristics of the Notes
The first three factors of the Roth Steel Tube analysis all pertain to the terms and conditions of the instruments which evidence the indebtedness. The use of formal notes or debentures is not, by itself, dispositive. Fin Hay Realty Co. v. United States,398 F.2d 694 (3d Cir. 1968); A. R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970). A valid debt may be created where no formal writing exists. Byerlite Corp. v. Williams,286 F.2d 285 (6th Cir. 1960). In the case before us, the instruments which petitioner would have us call stock are clearly marked as promissory notes. The corporate books reflected each advance as a loan and each promissory note as evidence of indebtedness. With the sole exception of the initial transfer of $ 150,000 which petitioner later attempted to reclassify, petitioner simultaneously received an unambiguous promissory note in exchange for each advance. The failure to provide *165 for interest payments is another indication of equity rather than debt. Road Materials, Inc. v. Commissioner,407 F.2d 1121 (4th Cir. 1969), affg. a Memorandum Opinion of this Court. Similarly, the absence of a maturity date is strongly indicative of a contribution to capital. Jewel Tea Co. v. United States,90 F.2d 451 (2d Cir. 1937). Each note issued by SME bears the fixed interest rate of prime plus one percent but does not include a fixed date of maturity. Although the repayments are not scheduled, an ultimate obligation to pay is apparent on the face of these promissory notes. However, it is interesting to note that the interest was not paid when due but only when the salons had generated excess income. In fact, petitioner received only $ 14,612.82 in interest throughout the time the corporation was in business, in addition to a payment made by SME to Citizens Fidelity Bank on petitioner's behalf. Although petitioner did not demand payment with respect to any of the promissory notes, SME also paid petitioner $ 5,469.38 in principal. These three Roth Steel Tube factors, thus constitute evidence of both debt and equity. Repayment *166 Options
Many of the Roth Steel Tube factors address the different degrees and natures of risk to which the creditor and the shareholder are vulnerable. By his very nature, the shareholder accepts a high proportion of the risk that the business might fail while the creditor's interests are protected, to a greater degree, and his right to recover his investment is greater in the event of business failure. Petitioner's risk of business failure in the SME hair salons equals the risk of any shareholder. SME had no assets other than necessary operating equipment which could provide a source of repayment to petitioner in the event of financial distress, and no collateral was pledged to protect petitioner. Similarly, the corporation did not maintain a sinking fund or reserve to provide repayment. Thus, analysis of the fourth, seventh and eleventh factors indicates characteristics of equity. Similarly, the corporation was exceedingly undercapitalized. If the amount of equity is limited to $ 15,000 and the face value of SME's debt is deemed to be $ 395,740.61 a debt/equity ratio results of 26 to 1. Thin capitalization, or a high debt to equity ratio is indicative of venture capital *167 rather than a loan. Gilbert v. Commissioner, supra at 407. The structure of capitalization reflects the extent of risk associated with the questionable instrument because a thinly capitalized corporation has fewer resources with which to repay its debts as well as indicating whether the degree of risk would preclude outside financing. Bauer v. Commissioner,748 F.2d 1365, 1369 (9th Cir. 1985). The fifth Roth Steel Tube factor demonstrates that the instruments in question had strong aspects of equity. Where the proceeds of the instruments are devoted exclusively to the purchase of capital assets, the instrument suggests an equity interest. Use of the advances to meet the daily operating needs of the corporation rather than to purchase capital assets is an indication of bona fide indebtedness. Roth Steel Tube Co. v. Commissioner, supra at 632; Raymond v. United States,511 F.2d 185, 191 (6th Cir. 1975). However, where the infusion of capital is devoted to the purchase of valuable and marketable capital assets there is an indication that repayment of the advance is not strictly limited to the profits of the business. *168 Litton Business Systems, Inc. v. Commissioner, supra at 379; Malone & Hyde, Inc. v. Commissioner,49 T.C. 575 (1968). Here, a distinction may be drawn between petitioner's initial contribution of $ 150,000 and his later advances of varying sums. The entire amount of the first contribution was spent on the purchase of the franchise licenses without which the corporation could not conduct business. However, unlike many capital assets which have a residual value which can be at least partially recovered, the franchise licenses were largely unmarketable. Petitioner testified that any resale of the franchise rights would be subject to conditions and restrictions imposed by the original seller and that a resale fee would be exacted. Thus, even immediately after the purchase the franchise licenses had little residual value. The remainder of the advances, however, were spent on assets used in the business and daily operating needs. Upon failure of the business, these other assets could be resold, as indeed they were, allowing some of the investment to be recouped. Thus, the tenth Roth Steel Tube factor indicates that the payment of $ 150,000 *169 contained more equity characteristics and the subsequent payments were symptomatic of both debt and equity. Inside and Outside Financing
The sixth, eighth and ninth factors examine whether the purported debt arrangement would have been acceptable to an outside lender. Although we use particular scrutiny in evaluating cases where the shareholders hold debt instruments in proportion to their equity holdings, such direct proportionality does not preclude a finding of a valid debt. J. S . Biritz Construction Co. v. Commissioner,387 F.2d 451 (8th Cir. 1967); American Processing & Sales Co. v. Commissioner,371 F.2d 842 (Ct. Cl. 1967). Where, as here, the shareholder and the creditor are one, the validity of a debt instrument can be gauged by testing whether it would have appealed to an outside lender. The fact that no reasonable outside lender would have extended credit on the terms available to the shareholder/creditor is evidence that the advances were capital contributions rather than loans. Stinnett's Pontiac Service, Inc. v. Commissioner,730 F.2d 634, 640 (11th Cir. 1984), affg. a Memorandum Opinion of this Court; Georgia-Pacific Corp. v. Commissioner,63 T.C. 790, 798 (1975). *170 Petitioner testified that he did not try to obtain outside financing because he knew from prior experience with franchise operations that lending institutions were loathe to make loans to such risky ventures. Instead, he took out a personal loan to fund his initial contribution to SME. He also purchased the Decker Mall salon as a going concern to provide working capital to the newer salons. Although petitioner offered no support for his view, we note that the loans probably might not have appeared very attractive to outside lenders. They were unsecured and the corporation owned no other assets for generating the revenue to provide an alternative source of repayment. Furthermore , the business was not established nor were all the principals experienced. Thus, an analysis of the sixth, eighth and ninth Roth Steel Tube factors also indicates that the instruments bore strong equity characteristics. Having considered all of these factors, we find that the instruments issued by SME to petitioner in exchange for advances contain characteristics of both debt and equity. On the one hand the risk of business failure was unavoidably associated with the instruments and no protection *171 through collateral, a sinking fund or alternative means of repayment was contemplated. The initial contribution was spent on assets which could not readily be sold although the subsequent advances were spent partly on capital assets and partly on daily operating expenses. The likelihood of repayment rose and fell in perfect synchronization with the fortunes of the business. On the other hand, petitioner himself characterized the instruments he received as promissory notes which strongly indicates that he intended to create a genuine and binding debtor/creditor relationship with the corporation. Similarly, the promissory notes purported to give petitioner an unconditioned right to payment of interest and principal if he chose to enforce it. Finally, SME made payments of both interest and principal during the year in issue. Thus, in classifying these instruments we must weigh the equity characteristics against the debt characteristics to determine the overall economic substance and effect. Although petitioner himself originally characterized the promissory notes as debt, he invokes the doctrine of substance over form and urges us to adopt the contrary position. The taxpayers *172 have little freedom to ignore the form of their own transactions and are ordinarily bound by the tax consequences that flow from the form of transactions they use. Bolger v. Commissioner,59 T.C. 760, 767 n. 4 (1973). In appropriate circumstances, however, a taxpayer may argue that the substance of the transactions, rather than their form, should control the tax consequences of the transactions. Glacier State Electric Supply Co. v. Commissioner,80 T.C. 1047, 1053 (1983). Where as here, the taxpayers seek to avoid the tax consequences of the form of a transaction, they must present strong proof that the substance of the transaction was different than its form. Landa v. Commissioner,206 F.2d 431, 432 (D.C. Cir. 1953); Coleman v. Commissioner,87 T.C. 178, 202 (1986), affd. in an unpublished opinion 833 F.2d 303 (3d Cir. 1987); Georgia-Pacific Corp. v. Commissioner, supra at 795. The taxpayer's burden is far heavier when his tax reporting positions and other actions did not consistently reflect the substance which he later argues should control the form. Illinois Power Co. v. Commissioner,87 T.C. 1417, 1430 (1986). *173 We conclude that petitioner has failed to establish that the promissory notes were erroneously characterized as debt. The form of the notes and the fact that interest and principal payments were actually made clearly indicates indebtedness. Perhaps most persuasive, however, is the fact that it is petitioner himself who chose the form of the transaction and he cannot be allowed to engage in post-transactional tax planning. Petitioner consistently took the position that the notes evidenced indebtedness, and we cannot believe his current contradicting assertions. Thus, we conclude that of the initial investment of $ 150,000 only $ 15,000 was a payment of venture capital made in return for 150 shares of stock. The remainder of the payment was originally characterized as debt and will be so considered. In light of the foregoing, Decision will be entered for the respondent.
Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The use of the terms "loan," "stock" and "promissory note" is merely for our convenience in describing certain documents which were exchanged between petitioner and the corporation and such terms are not intended to signify any particular tax consequences. ↩
3. Letters to petitioner from his attorney dated May 24, 1979, and May 25, 1979, indicate that the decision to cast the transfer partially as a loan rather than as a contribution to capital or a purchase of stock occurred considerably after the actual payment.↩
4. Unlike the subsequent promissory notes, the promissory note for the initial transfer of $ 135,000 contained an interest rate of the prime rate.↩
5. Section 385 was added by the Tax Reform Act of 1969 and empowers the Secretary of the Treasury to promulgate regulatory guidelines on the debt-equity issue. Regulations were proposed in 1980 and withdrawn. New regulations were proposed in 1982 and then withdrawn in 1983. No new regulations have since been proposed.↩
6. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940↩ (1971).